MARVA WILLIAMS, REBECCA EVELYN
McCLELLAND,
and
MARY LOUISE McCLELLAND *v.* STATE
OF MARYLAND

[No. 89, September Term, 1968.]

*Decided November 20, 1968.*

452

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Tucker R. Dearing* for appellants.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard J. Kinlein, State's Attorney for Howard County, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *Ronald M. Naditch, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

·ORTH, J., delivered the opinion of the Court.

Each of the appellants was found guilty by a jury in the Circuit Court for Howard County of aiding and abetting in the escape of Harry LaRue McClelland, who was undergoing lawful imprisonment in Patuxent Institution, and with conspiring to aid and abet his escape. Each appellant was sentenced to the custody of the Commissioner of Correction for an indeterminate period not to exceed 3 years on each conviction, the sentences to run concurrently. On appeal from the judgments the sole contention is that the evidence was not legally sufficient to sustain the convictions.

## APPELLATE REVIEW OF THE SUFFICIENCY OF THE EVIDENCE

We think it advisable to discuss the authority and function of this Court in its review of the sufficiency of the evidence in a criminal case. The right of a person charged by this State with a criminal offense to be tried by a jury is guaranteed by Art. 5, Declaration of Rights, Constitution of Maryland and Amendment VI, Constitution of the United States.[1] He may,

---

1. The right to an impartial jury guaranteed by Amendment VI to the Constitution of the United States was made applicable to

however, waive the right and elect to be tried by the court.[2] Md. Rules, 741. Art. XV, § 5, Constitution of Maryland, prior to the amendment effective 1 December 1950, provided: "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of Fact." [3] As a corollary to this provision, in the absence of other provisions by statute, it became the settled law of Maryland that the Court of Appeals would not pass on the legal sufficiency of evidence to convict in a criminal case where the case was tried by a jury and, by analogy to the constitutional provision, it was repeatedly held by the Court of Appeals that it would not pass on the legal sufficiency of the evidence to convict where the case was tried by the court sitting as a jury. *Abbott v. State,* 188 Md. 310, 313. See *Jones v. State,* 188 Md. 263, 273; *League v. State,* 36 Md. 257. Compare *Winkler v. State,* 194 Md. 1. The first change with respect to appellate review of the sufficiency of the evidence in criminal cases came with the adoption of the General Rules of Practice and Procedure by the Court of Appeals, effective 1 January 1950. Rule 7(c) of Part Four, relating to Criminal Rules,[4] con-

---

**2.** The history of the authority of an accused to elect to be tried by the court sitting as a jury may be traced through c. 57, § 19, Acts 1793; ch. 144, § 2, Acts 1809; ch. 399, § 17, Acts 1957 (repealed by ch. 588, § 1, Acts 1963); *Rawlings v. State,* 2 Md. 201; *Rose v. State,* 177 Md. 577. See *Journigan v. State,* 223 Md. 405, 409, note 3.

**3.** For a history of this section see *Slansky v. State,* 192 Md. 94.

**4.** The Reporter's Notes on Criminal Rule 7 stated:

"This proposed rule is a complete departure from existing law that criminal trials by the court without a jury are subjected to the same rules of procedure as those with a jury, including appealability."

In the Memorandum on Motion for Reargument in *Edwards v. State,* 198 Md. 132 at 157, the Court of Appeals characterized Rule 7 as "* * * a complete departure from the pre-existing law which permitted no appellate review of facts."

tained, in substance, the provisions of Rule 1086, Maryland Rules of Procedure, now in effect, and applicable to this Court.[5] Rule 1086 provides:

> "When a case has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

So it was not until 1 January 1950 that there could be an appellate review to determine the sufficiency of the evidence to sustain a conviction in a criminal case and then such review was limited to those cases tried by the court without a jury.[6] However, Art. XV, § 5 of the Constitution of Maryland was amended, effective 1 December 1950 by adding to the existing provisions the clause "except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." [7] The amendment was implemented by statute, now Md. Code, (1967 Repl. Vol.), Art. 27, § 593, and rule of Court, now Md. Rules, 755.[8] Art. 27, § 593 provides:

---

5. Rule 1086 is substantially the same as Rule 886a, applicable to appeals to the Court of Appeals.

6. But Criminal Rule 6(b) then adopted permitted the accused to request an advisory instruction that the evidence was insufficient to justify his conviction and it was the duty of the trial court, when requested, to give the jury an advisory instruction whether or not there was evidence legally sufficient to sustain a conviction. The giving or refusal of such an instruction was reviewable by the Court of Appeals. *Wright v. State,* 198 Md. 163, 170.

7. The amendment was proposed by the Legislature in 1949 (ch. 407 Acts 1949), ratified 7 November 1950 and became effective upon the Governor's proclamation on 1 December 1950.

8. The development of the present status of the law under the constitutional provision as amended may be traced through the statutes enacted and rules adopted from time to time. See ch. 596, § 655A, Acts 1949; ch. 588, § 6, Acts 1963; ch. 213, Acts 1967; Criminal Rule 5A; Md. Rules, 738 (revised and renumbered as Md. Rules, 755). The changes were in effect procedural—from a request for advisory instructions that the evidence was insufficient

"In the trial of all criminal cases, the jury shall be the judges of law, as well as of fact, except that at the conclusion of the evidence for the State a motion for judgment of acquittal on one or more counts, or on one or more degrees of an offense, may be made by an accused on the ground that the evidence is insufficient in law to justify his conviction as to any such count or degree. If the motion is denied, he may offer evidence on his own behalf without having reserved the right to do so, but by so doing, he withdraws his motion. The motion may be made at the close of all the evidence whether or not such motion was made at the conclusion of the evidence for the State. If the motion is denied the defendant may have a review of such ruling on appeal."

Rule 755b provides to like effect as to the making of a motion for judgment of acquittal and Rule 755c provides that if the lower court on such motion or on its own motion determines that a judgment of acquittal should be granted, it shall direct the clerk to enter it. If the case is tried before a jury it shall not be necessary for the jury to render a verdict.

It is clear therefore that under the present status of the law there may be an appellate review of the sufficiency of the evidence to sustain the conviction in a criminal case. But the issue comes before us in a case tried by the lower court sitting as a jury in a different posture than when the case is tried by a jury. In a non-jury case Rule 1086 specifically provides that we shall review the case upon the evidence (as well as the law) and we must determine whether the lower court was clearly wrong on the evidence in finding a verdict of guilty. In a jury case if the lower court finds upon motion for judgment of acquittal that the evidence is sufficient in law to justify a conviction, it denies the motion, and permits the evidence to go to the jury. On appeal we determine whether the denial of the motion was proper. It is because of this difference in the posture

---

prior to the amendment (see note 6 herein) to a motion for instruction or directed verdict based on the insufficiency of the evidence to a motion for judgment of acquittal in the place of such motions. See *Giles v. State,* 229 Md. 370, 383-386.

of the issue of the sufficiency of the evidence that we may entertain the issue on appeal in a jury case *only* upon the denial by the lower court of a motion for judgment of acquittal [9] but we must entertain the issue in a non-jury case when presented on appeal even in the absence of a motion for judgment of acquittal below.[10] See *Lotharp v. State,* 231 Md. 239; *Nicholson v. State,* 229 Md. 123; *Elliott v. State,* 215 Md. 152; *Jason v. State,* 1 Md. App. 136.

The question arises as to what test is to be applied on appeal in determining the sufficiency of the evidence (1) to sustain a conviction in a non-jury case, and (2) to justify its submission to the jury in a jury case. The first occasion the Court of Appeals had to apply the rule [then Criminal Rule 7(c)] pertaining to a non-jury case was in *Lambert v. State,* 196 Md. 57. The Court said, page 68:

> "That rule was adopted for the purpose of preventing a possible miscarriage of justice by permitting the determination of one judge to take away the life or liberty of an accused without a review by any other tribunal. It was not intended, and will not be construed, to permit us to reverse judgments merely be-

9. The motion may be made on one or more counts or one or more degrees of the offense at the close of evidence offered by the State or at the close of all the evidence. Such motion made at the close of evidence offered by the State is withdrawn if the accused thereafter offers evidence. Md. Rule 755b.

10. Of course, a motion for judgment of acquittal may be made in a non-jury case. If granted the accused is acquitted. If denied and the accused is convicted, the review required under Rule 1086 necessarily includes the review under the denial of the motion. But if the evidence be found sufficient to sustain the conviction, it follows that the denial of the motion was proper. See *Diggins v. State,* 198 Md. 504, 506 and *Gray v. State,* 4 Md. App. 175, 179. In *Diggins* the Court indicated that in non-jury cases the review under what is now Rule 1086 "may perhaps, in practice", render what is now Rule 755, superfluous. In *Gray,* a non-jury case, we said that "the appellant's urging that the lower court erred in not granting his renewed motion for Judgment of Acquittal at the close of the entire case is redundant and merges with his second contention that the evidence was not sufficient to sustain the conviction."

cause our conclusion on the record is different from
that of the trial judge. It is only intended to prevent
manifest error."

The rationale of the rule was again so stated in *Edwards v.
State,* 198 Md. 132, 151. In the Memorandum on Motion for
Reargument in that case the Court discussed the matter at length,
noting that it was the first time it was suggested that the pro-
vision that "the verdict of the trial court shall not be set aside
on the evidence, unless clearly erroneous, and due regard shall
be given to the opportunity of the trial court to judge of the
credibility of the witnesses" means any less than it says. It an-
swered counsel's question how the Court of Appeals could ever
say that the trial court is clearly wrong by stating, at page
159:

"This question can only be answered as and when
it is presented, case by case. If we recognize the differ-
ence between the roles of triers of facts and appellate
courts, and the terms of Rule 7, it is expected that such
cases will be rare * * *."

By a long line of cases since *Lambert v. State, supra,* it has
been firmly established that the test to be applied by the Court
of Appeals and this Court in reaching a determination of the
sufficiency of the evidence in a non-jury case is whether the
evidence either shows directly or supports a rational inference
of the facts to be proved, from which the lower court could
fairly be convinced, beyond a reasonable doubt, of the defen-
dant's guilt of the offense charged.[11]

*Shelton v. State,* 198 Md. 405 appears to be the first case
decided by the Court of Appeals in which Art. XV, § 5 of the
Maryland Constitution as amended was applicable. The Court
said, at p. 412 that it would not reverse the judgment of the
lower court "if there is any proper evidence before the jury
on which to sustain a conviction," and held that the evidence
in that case "was sufficient to warrant its submission to the
jury." The test to be applied by the Court of Appeals and this

---

11. *Gibson v. State,* 238 Md. 414 and *Roeder v. State,* 4 Md. App.
705 are illustrative of the cases so holding.

Court in determining whether the case or a particular issue was properly submitted to the jury has been stated a number of times as whether there was any relevant evidence adduced at the trial which would properly sustain a conviction.[12]

Although the manner in which the question of the sufficiency of the evidence comes before us when a case is tried by the lower court without a jury is different than when a case is tried below by a jury, we see no material difference in the tests applied in determining the question. It is clear that in each instance the weight of the evidence and the credibility of the witnesses are matters for the trier of facts. *Shelton v. State, supra,* at p. 412 and *Graef v. State,* 1 Md. App. 161 (jury cases); *Weaver v. State,* 226 Md. 431 and *Dunlap v. State,* 1 Md. App. 444 (non-jury cases). In order to meet the test of legal sufficiency in any criminal case the evidence must show directly the fact to be proved or support a. rational inference of the fact. The fact must be shown or the inference supported beyond a reasonable doubt or to a moral certainty. *Shelton v. State, supra,* at pp. 411-412. And while the clearly erroneous rule is not specifically applicable to jury cases, the Court of Appeals said in *Royal v. State,* 236 Md. 443, 448:

> "[W]e have consistently held that in order to overturn a judgment entered on the verdict of a jury for insufficiency of the evidence it is necessary to show that there was no legally sufficient evidence or inferences drawable therefrom on which the jury could find a defendant guilty beyond a reasonable doubt." See *Coates v. State,* 232 Md. 72; *Wright v. State,* 222 Md. 242.

Once the question of the sufficiency of the evidence is properly before us, we believe that the criteria used to determine the question is the same, be the verdict rendered by the court or a jury. Whether the test applicable to jury cases is stated in the affirmative—the judgment will be affirmed if there is any relevant evidence before the jury to sustain a conviction—or

---

12. *Clarke v. State,* 238 Md. 11 and *Plumley v. State,* 4 Md. App. 671 are illustrative of the cases so holding.

in the negative—to overturn a judgment there must be no legally sufficient evidence on which the defendant could be found guilty beyond a reasonable doubt—it is inherent that to be sufficient in law to justify the conviction within the intent of Art. 27, § 593 the admissible evidence adduced must show directly or support a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. If it does, there is "relevant evidence" and if it does not there is "no legally sufficient evidence." In other words we do not believe that evidence can be sufficient to permit its submission to the jury unless it is sufficient for the jury to find the defendant guilty beyond a reasonable doubt. And if the appellate review be considered more limited or the test with respect to the sufficiency of the evidence be construed as less demanding to sustain the conviction with regard to a jury trial than with regard to a court trial, serious question might arise as to a violation of the defendant's right to a trial by jury. We feel that the apparent difference in the stating of the two tests is one of semantics and not substance. When an accused elects to be tried before the court without a jury, the court is substituted for the jury and has the same function in passing upon the guilt of the accused. *Smith v. State,* 182 Md. 176, 189; *Berger v. State,* 179 Md. 410, 417; *League v. State, supra,* 265. We think that whether the question comes before us as a contention that the trial court was clearly wrong in reaching a verdict of guilty on the evidence or as a contention that the evidence was insufficient in law so as to preclude it from being submitted to the jury, the test is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged.[13]

---

**13.** In *Brooks v. State,* 3 Md. App. 485, a jury case, we said at 511: "In reviewing the lower court's denial of a Motion for Judgment of Acquittal, made at the conclusion of the case, the review becomes a determination of the sufficiency of the evidence." We found in that case that "there was legally sufficient evidence from which the jury could be reasonably convinced beyond a reasonable doubt of the appellant's guilt."

If there was such evidence, the lower court would neither be clearly erroneous, in a trial without a jury, in finding a verdict of guilty, nor in error, in a jury trial, in denying a motion for judgment of acquittal. And if there was no such evidence, the lower court would be clearly erroneous, in a trial without a jury, in finding a verdict of guilty, and in error, in a jury trial, in denying a motion for judgment of acquittal. Whether the lower court was clearly erroneous in its judgment on the evidence in a non-jury case or erred in allowing the evidence to go to the jury in a jury case, we would be obliged to set aside the judgment when the question was properly before us.[14]

### THE SUFFICIENCY OF THE EVIDENCE
### IN THE INSTANT CASE

A summary of the evidence in the instant case is as follows. It is not disputed that Harry McClelland,[15] the son of appellant Rebecca Evelyn McClelland, the brother of appellant Marva Williams and the husband of appellant Mary Louise McClelland, was lawfully confined in Patuxent Institution. On 17 May 1967 he was brought to the courthouse in Annapolis by two correctional officers for trial on a charge that he had escaped from the Maryland House of Correction in 1964. When they

----

14. We note that in *Diggins v. State, supra,* the Court referred to "the full review upon the evidence" under Rule 7c (now Rule 1086) and "the limited review" under Rule 7b (now Rule 755) relating to motions for judgment of acquittal. However, we cannot conceive of a case where, on the same evidence, we could properly hold, if a jury were the trier of fact, that the evidence was sufficient to permit its submission to the jury, but, if the court were the trier of fact, that the evidence was not sufficient to sustain the conviction.

15. Harry McClelland testified for the defense. He admitted to the following convictions and sentences: aggravated assault in 1953—3 years; grand larceny in 1956—2 years; parole violation in 1959—9 months; larceny and receiving in 1960—11½ to 23 months; larceny in 1961—2 years; parole violation in 1962—2 years; armed robbery in 1963—5 years; armed robbery in 1965—30 years; riot in the Maryland Penitentiary in 1967—10 years; escape from the House of Correction in 1964 for which he was tried on 17 May 1967—5 years. He said he had "somewhere in the neighborhood of 73, 74" years yet to serve.

arrived at the courthouse it was discovered that Malcom Christensen, also confined at Patuxent, whom McClelland desired as a witness, was not present. McClelland was taken to the county detention center and the officers returned to the Institution for Christensen, arriving back with him about 1:00 P.M. and on the way picking up McClelland at the detention center. McClelland and Christensen were placed in the "bull pen," a small room "rather antiquated looking" with a little vestibule on the inside. "And it had a small window in the door with a wire screen over it, and it isn't possible to pass anything from the vestibule into the bull pen itself." That morning when McClelland was brought to the courthouse the appellants were there and he wanted to speak to them. He was not permitted to do so at that time because the Sheriff, in whose custody he had been placed, was busy. McClelland "raised quite a disturbance because he was very anxious to talk to them." When he and Christensen were placed in the bull pen, however, the Deputy Sheriff allowed the appellants to talk to him through the screened window in the bull pen door. They conversed about 10-15 minutes. McClelland and Christensen were then taken to the courtroom by the correctional officers. No one else had contact with either McClelland or Christensen from the time they left the bull pen until they arrived in the courtroom. The trial started at 1:45 P.M. and concluded at 3:45 P.M. One of the correctional officers was seated on a bench in the courtroom with the appellants. Rebecca McClelland remained in the courtroom during the entire trial but Marva Williams and Mary Louise McClelland left about 5 minutes after the trial began. After the trial was over, the officers handcuffed both McClelland and Christensen immediately outside the courtroom, took them back to the bull pen, put a waist chain and a "connector chain" on them, hooking the two men together, and took them out to the automobile to convey them back to Patuxent. A classifications officer from the Maryland House of Correction, subpoenaed as a witness at the trial, was also present, as the correctional officers were to drive him to the House of Correction. There was no personal contact with the prisoners by anyone other than the officers from the time they left the courtroom until they reached the automobile, a 1965 Plymouth Fury

parked at the side entrance to the Court House "as you enter the parking lot." The three officers sat in the front and the prisoners in the back. As they drove on State route 175 in the vicinity of Crownsville State Hospital, the prisoners yelled "out real loud," and one said, "Put your hands behind your head and keep driving straight ahead as if nothing happened." Frank J. Zemanick, one of the correctional officers, turned around and "Christensen had in his hands a .32 automatic pointing directly at me." The officers did as directed; each passenger put his hands behind his head, the driver drove as if nothing happened. Zemanick was ordered to give the prisoners the keys to the shackles. He said, "Supposing I don't?" and received the reply, "We'll blow your damned head off." Thereafter the prisoners took possession of the car and escaped. There was testimony that before prisoners leave the Institution "They're required to strip completely to the skin. They're given a change of clothing. Prior to being shackled on a return trip from the Court House they're given a routine shakedown, pat, so to speak." The prisoners were given this routine shakedown as they left the Court House. They were "patted down" around the waist and legs. On cross-examination of Zemanick it was developed that the two appellants who had left the courtroom were observed in the corridor near the courtroom during a recess of the trial. The prisoners went to the men's room during a recess accompanied by the correctional officers and used the urinal. They did not enter one of the enclosed cubicles. McClelland left first with Zemanick because the bailiff said the trial was about to resume; Christensen remained in the men's room with the other officer. There was also conversation between McClelland and the appellants in the hall after the trial but "just the normal things" like goodbye. The automobile in which the prisoners were placed after the trial was not thoroughly searched immediately before the prisoners entered it. The seats were not removed, nor did the officers look under or alongside of the seats. The car was unlocked while it was parked, the usual procedure at Annapolis because "the parking facilities are terrible" and at times there is a trustee "to jockey the cars around in order to get all the cars in there."

Willie Foote, retired, testified that about 9:45 A.M. on 17

May he was standing at the corner of Cathedral and West Streets when two women, whom he identified at the trial as Mary Louise McClelland and a Bernadette McClelland, came up and asked him where they could buy bullets. He told them "There's a place right there, Henry B. Miles." Mary Louise McClelland said, "I been there but they didn't have any." He told her, "Well go to the pawn shop. They got them." The pawn shop was right across the street. The women left and shortly afterwards came back. He asked Mary Louise McClelland if she got what she went after and she told him she had. He said, "What did you get" and she said, "Bullets." He continued: "And they went down the street running, see, right down West Street to the circle * * * towards the Court House" about a block and a half away. He saw them again the same day about 12:10 P.M. He was on the same corner and they came out of Calvert Street. "And I beckoned to 'em, I said, 'Come here' and they came over to me. And I said to 'em, I said, 'You didn't kill anybody, did you? Did you kill your boy friend or kill your husband?' And they laughed and went away * * * on down to West Street to the circle * * * towards the Court House." On this occasion he also asked where their home was and he thought it was Mary Louise McClelland who said that it was Baltimore. "And I said to her, I says, 'Why you come down here to buy bullets?' She said, 'I'm getting them for my brother.'" About an hour later he saw them again. They went into the South Street side of the Health Department building and he entered on the Cathedral Street side. He had a conversation about them with a Mrs. Bea Powell. He told Mrs. Powell, "I don't know what these girls up to, but * * * you keep your eye on them." He saw the women leave the building and go in the side entrance of the Court House.

Mrs. Beatrice Powell testified that she met Willie Foote about 1:30 P.M. on 17 May in the Health Department building. Based on information she received from him she walked out the door with him to the corner of South and Cathedral Streets and saw two women walk toward Franklin Street. About 1:50 P.M. she went out to put money in a parking meter and saw the same women sitting in the right hand rear seat of a white car with a State license tag. At the trial she was shown a photograph

of the car in which the prisoners were transported to and from the Court House and she identified it as the car in which she saw the women sitting. "They were not sitting as passengers would be ordinarily sitting in a car. They were both sort of on the right hand side of the car, in the rear of the car * * * It seemed like they were sort of down fooling around under the floor or something." One of them said, "Here comes a nurse," and they got out and shut the door. Mrs. Powell put money in the parking meter and turned around to see where the women had gone. "They * * * seemed to be watching me." She walked to the Court House parking lot attendant and asked him what the two women were doing in the car. She saw them again about 2:45 P.M. when she went to the Court House to get a newspaper. They passed by the paper stand. About 3:45 P.M. she was at her desk in the Health Department building and looking out a window facing the Court House door she saw two handcuffed prisoners with three guards. They got in the same car she had seen the women in, the prisoners in the back and the guards in the front. She made an in-court identification of Mary Louise McClelland as one of the women she saw but was not positive as to the identity of the other woman.

Sam Snyder, a merchant operating the Economy Supply at 25 West Street, about a half block from Cathedral Street, testified that about 1:00 P.M. on 17 May three women came in his place of business. One stayed near the door and the other two went towards the back of the store and asked him if he had any bullets for sale. He identified them as Rebecca McClelland, Mary Louise McClelland and Marva Williams. Rebecca McClelland asked for the bullets. Mary Louise McClelland was near her and Marva Williams was by the door. He told them he had no bullets. On cross-examination he said it was .32 caliber bullets Rebecca McClelland asked for.

Elerk Rosenbloom, owner and operator of People's Loan Office, 67 West Street, one store away from West and Cathedral Streets testified that he was a licensed dealer of firearms and bullets. On 17 May two women came in his store in the afternoon—"it was after lunch sometime"—and asked for six bullets for a .32 caliber automatic. He told them they could buy

eight for a dollar and they bought eight bullets. "It was two colored women * * * I would say in their thirties." [16]

Sergeant Robert Flannery of the Anne Arundel Police Department testified that a .32 caliber weapon was "later recovered from one of the prisoners in Pennsylvania." A line-up was conducted at which Sam Snyder positively identified Mary Louise McClelland and "a possible * * * on Marva Williams;" Beatrice Powell positively identified Mary Louise McClelland and Marva Williams; Willie Foote positively identified Mary Louise McClelland.

Harry M. McClelland and Christensen testified in behalf of the appellants. McClelland said he knew about a month and a half in advance that his trial had been set for 17 May; he asked for a speedy trial in Annapolis for the purpose of trying to escape. "I was planning on going just by strong-arming, if I could, the guards that * * * took me." When Christensen was sent to Patuxent "we constructed a plan to escape together." Christensen said he could get a weapon. So he had Christensen summoned as a witness. By a pre-arranged plan, the gun was left in the waste basket in the men's room. Christensen got it from the basket when McClelland diverted the attention of the guards. Christensen had the gun on his person from then on. At the time of the escape Christensen got the gun "by reaching down towards his leg." He denied that the appellants knew anything about the plan to escape or about the gun.

Christensen admitted in his direct testimony to an extensive criminal record starting with a conviction for armed robbery in 1948 and ending with a sentence of 97 years received in 1967 for convictions of escape from the Maryland Penitentiary and other charges relating thereto. Between 1948 and 1967 he had been convicted of armed robbery at least four times and had been convicted of other crimes including an escape from a prison in California. He said that when he learned of the date of McClelland's trial "I automatically then sent out a letter to make arrangements for the escape * * * to parties in Baltimore."

---

16. The record shows Marva Williams to be 26 years old, Mary Louise McClelland 33 years old and Rebecca McClelland 53 years old.

The letter was sent from Patuxent but not through the regular channels—it was "kited out the back door * * * I paid an officer five dollars to take it out * * * Basically the letter stated the time and the date and where I was going to Court and how the Court was set up and where the person was to leave the gun and what type of gun I wanted * * * The instructions was to leave the gun in the men's room—the men's bathroom is right next to the courtroom—and to leave the gun in the trash receptacle in the bathroom." He asked for a .32 automatic because its compact and small. When he and McClelland were taken to the men's room he got the gun from the trash receptacle. He was going to escape right there but there were too many people in the hall. He put the gun into his belt under his shirt. In the Court Room he removed the gun from his belt and put it into his sock; during an exchange between McClelland, his attorney and the judge "everyone was watching the Judge. When they watched the Judge I went south with the gun." He had taken two pieces of elastic and "made like garters to fit tight around the leg * * * If I had to put the gun there * * * it would hold it." At the time of the escape he took the gun from his sock. He said he saw the man who left the gun for him on 17 May in the Court House but refused to give his name or otherwise to identify him. On cross-examination he claimed he was searched only when he left Patuxent and was not searched before he got into the automobile after the trial.

Each of the appellants testified. With regard to 17 May they denied speaking to Willie Foote, denied purchasing or attempting to purchase bullets from any store in Annapolis, denied being absent from the Court Room during the trial except for a few minutes on two occasions, denied being in the automobile used to transport the prisoners and denied having any knowledge of the gun or the escape plans.

Upon the motions for judgment of acquittal made at the close of all the evidence it was the duty of the lower court to determine whether the evidence was legally sufficient to permit its submission to the jury. It would be legally sufficient if it showed directly or supported a rational inference of the facts to be proved from which the jury could fairly be convinced beyond

a reasonable doubt of the appellant's guilt of the offenses charged. The facts to be proved were, first, that Harry Mc-Clelland had committed an escape proscribed by Md. Code, Art. 27, § 139 and, second, that the appellants had aided or assisted in that escape, also proscribed by the statute, and conspired to so aid and assist, an offense under the common law.[17] It is clear that the evidence showed that Harry McClelland committed an escape within the purview of § 139, *Fabian v. State,* 3 Md. App. 270, and the appellants do not contend otherwise. In the exercise of our function on review there remains only our determination whether the lower court properly found that the evidence and rational inferences therefrom were legally sufficient for the jury to be fairly convinced beyond a reasonable doubt that the appellants aided or abetted the escape and conspired to so aid and abet. In our determination we recognize that the lower court was guided by established rules in arriving at its finding. That is the weight of the evidence and the credibility of the witnesses were matters for the jury. *Shelton v. State, supra; Graef v. State, supra.* The jury was under no obligation to believe Harry McClelland's or Christensen's version of how the gun was obtained nor the denials of the appellants. Therefore, if other evidence was legally sufficient to sustain the convictions, the motions were properly denied. We think there was such evidence. It is not disputed that the appellants were in Annapolis on the day of the escape. There was evidence that a .32 caliber automatic was the weapon used to effect the escape; that Mary Louise McClelland had inquired where bullets could be purchased; that Rebecca McClelland, in the presence of Mary Louise McClelland and Marva Williams, had attempted to buy .32 caliber bullets; that "two colored women" had bought eight bullets for a .32 caliber automatic; that Mary Louise McClelland and another woman were sitting in the car in which the prisoners were later transported and were in the rear seat where the prisoners were placed; that they

---

17. The 1st count of the indictment charged that the appellants did aid and abet the escape; the 2nd count charged that they were accessories thereto; the 3rd count charged conspiracy to aid and abet. The State abandoned the 2nd count and the case went to the jury on the 1st and 3rd counts.

were "sort of down fooling around under the floor or something;" that the prisoners were thoroughly searched before they left Patuxent; that they were continually in the presence of one or more of the guards with minimal opportunity for physical contact with any other person; that they were searched immediately before they were placed in the automobile after the trial; that the automobile was not then searched; that earlier that day the appellants had a 10 or 15 minute conversation with Harry McClelland; that the appellants were closely related by blood or marriage to Harry McClelland. We think that the evidence was sufficient to support a rational inference from which the jury could be fairly convinced beyond a reasonable doubt that the appellants aided and abetted the escape [18] by the buying of bullets for the weapon and the placing of the weapon in the automobile and that they conspired together so to do.[19] And even if the evidence be considered as "solely circumstantial" we feel that the circumstances, taken together are inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence. See *Nichols v. State,* 5 Md. App. 340. Therefore the lower court did not err in denying the motions for judgment of acquittal.

> *Judgments affirmed: appellant Williams to pay one-third of the costs.*

---

18. At common law the appellants may have been guilty of the crime ordinarily called "rescue of a felon" or of being accessories before the fact to the crime of escape. See *Fabian v. State,* 3 Md. App. 270; *Agresti v. State,* 2 Md. App. 278. But Md. Code, Art. 27, § 139 created the statutory crime of aiding or assisting an escape. It was made a felony by the Acts of 1966, ch. 628, applicable to crimes committed on and after 1 June 1966. Therefore the appellants were principals in that crime. There is no practical distinction in Maryland between principals in the first and second degree.

19. The gist of a conspiracy is the entering into of the illegal scheme or design and once this occurs, the crime is complete without the doing of an overt act. The conspiracy may be shown by circumstantial evidence from which an inference of a common design may be drawn, it not being vital to demonstrate that the conspirators met and agreed in terms to a set design and to pursue it by common means. *Price v. State,* 4 Md. App. 701, 704.