LOWELL DOUGLAS HOWELL, JR. AND LEONARD
FRANCIS KASCHENBACH, JR. v. STATE
OF MARYLAND

[No. 401, September Term, 1975.]

*Decided January 5, 1976.*

The cause was argued before ORTH, C. J., and MORTON and LOWE, JJ.

*Raymond M. Faby, Assigned Public Defender,* for appellant Lowell Douglas Howell, Jr. *James J. Fabian,* with whom was *John W. Pfeifer* on the brief, for appellant Leonard Francis Kaschenbach, Jr.

*Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *William S. Townsend, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court. LOWE, J., dissents and filed a dissenting opinion at page 659 *infra.*

I

The primary issue in this appeal is whether the tear gas gun in this case is a handgun within the contemplation of Code, art. 27, § 36B (d), proscribing the unlawful use of a handgun in the commission of certain crimes. We hold that it is.

## STATEMENT OF CASE

Lowell Douglas Howell, Jr. and Leonard Francis

Kaschenbach, Jr., jointly tried at a bench trial in the Circuit Court for Baltimore County on 27 February 1975, were convicted of feloniously assaulting Merlin Harry Clough with intent to rob him, and of unlawfully using a handgun in the commission of a felony.[1] Each accused was sentenced to five years.[2] On 3 March, Kaschenbach filed a motion for a new trial. On 26 March Howell noted an appeal. On 7 April, Kaschenbach's motion for a new trial was heard and denied. On 25 April he noted an appeal. By our order of 10 July 1975, upon motion of the State, and pursuant to Maryland Rule 1035 b (3), we dismissed the appeal noted by Kaschenbach "insofar as it goes to the judgment . . . entered on February 27, 1975, . . . as not having been filed with the lower court within the time prescribed by Maryland Rule 1012. . . ." We further ordered Kaschenbach's appeal, "insofar as it goes to the denial of a motion for a new trial, be, and is hereby, limited to the issue of the propriety of the trial court in its denial of that motion."

## THE EVIDENCE

At the guilt stage of the trial, Clough testified that while driving on the Beltway he gave two hitchhikers a ride. When he stopped to let them out "the guy in the front pulled a gun out, and stuck it up to my head, and asked me if I had any money, and I told him I didn't. Then he said, get out. So I got out." He described the gun: " [i]t was a .22, it looked like a .22 to me anyway. . . . It was, I think it was just like a black or darkish color." On cross-examination he was asked how

---

1. The convictions were under the second and third counts of the indictment jointly charging them. The court found both accused not guilty on the first count charging the assault of Clough "because that merges into the second count." The State "abandoned" the fourth count, charging the larceny of the use of Clough's automobile. This is according to the transcript of the proceedings at the guilt stage of the trial. At the penalty stage the court observed, "The State abandons counts one and four." We note that the docket entry under date of 27 February 1975 reads: "State abandons counts 1 and 4."

2. The judge imposed sentence thus: "As to both Defendants, on count number two, five years in the Department of Correction, suspended indefinitely. As to count number [three], five years in the Department of Correction; the sentences to run concurrently." The court at first referred to count four but shortly thereafter indicated it meant count three.

he arrived at the conclusion that it was a .22. He said: "Well, I'd seen a lot of .22s, and when I saw it out of the corner of my eye, that's what it looked like pretty much to me. . . . It was a dark color, like a blackish or a dark blue." Shortly after the commission of the offense, Howell and Kaschenbach, on foot, were seen by Corporal Franklin E. Pugh of the Baltimore County Police. Pugh had received a report of the Clough incident over his police radio, and the men he saw answered the description of the felons. He accosted the two men. "At this time I observed a small handgun laying on the ground behind the two subjects, directly beneath, behind them. . . . And when I stopped them when I looked down directly behind the two subjects I was standing in front of, the handgun was laying on the ground." Pugh described the weapon: "It was a model 1969 .22 caliber gas, made in Italy, black with brown plastic grips." Kaschenbach had "a small brown holster" hooked to his belt "right in the small of his back." The gun and holster were received in evidence without objection. Howell testified in his own defense. On cross-examination he said that he knew that Kaschenbach carried "this tear gas gun for self protection. . . . He told me about it, but that's the first time I seen it, that night." Kaschenbach also testified. He admitted that he "did carry a tear gas gun for my protection, because last year I was jumped by six guys, and it's on record at Essex Police Station, and so I purchased a gun, which is not fatal but is harmful, to give me enough time to get away from attack." He did not have a permit for it, ". . . I didn't think I needed one; I didn't know if it was actually illegal."

At the hearing on Kaschenbach's motion for a new trial, the Assistant State's Attorney told the court: "Your Honor, we have secured the services of a mutually acceptable expert in the person of Mr. Howard Donahue." Howard T. H. Donahue, the owner of Donahue's Gun Specialties, was called by Kaschenbach and gave his qualifications. The State stipulated "as to Mr. Donahue's qualifications as an expert witness in the field of guns generically." He was shown the gun admitted in evidence. Donahue said that he had examined it a short time ago in his shop. Upon questioning

by defense counsel he testified, as we understand it, that the weapon could not be readily converted "by normal, simple tools" into a conventional pistol which would fire bullets. There was a baffle which made very difficult the drilling out of the barrel to open it completely. On cross-examination, however, he discussed the explosive mechanism used to discharge the weapon. He was shown two copper caps. He identified each as "a tear gas projectile." One had been fired. "It's apparent that one has been fired by seeing a relatively heavy imprint of the firing pin on the rear of the place and also the slightly swollen nature of the place, which would indicate an explosion took place within." According to Donahue, "As far as the weapon is concerned, the name tear gas is a misnomer." He explained: "Tear gas is a rather large quantity of very fine particles, it's not actually a gas at all. And to fire it, firing would expel these projectiles, which are very highly irritating to the eyes. . . . My opinion is that if the gun were pointed at somebody's face, whether it contained blank or tear gas, at close proximity, that is, two feet or less, it would be extremely destructive to an individual's eyes." The witness was asked:

> " [I]n the case of the weapon you have examined, and that you have in your hand at this moment, and relating that weapon to the casings, which I have also asked you to examine, do I understand correctly that it is your opinion that the propellant for the tear gas, the infinitely small tear gas projectile you referred to, is some form of explosive?"

Donahue replied:

> "Well, chemically you have a mercury oxide cyanate, or fulminate of mercury, or one that stiffenates, which is a nitrate compound, and it's an explosive; in fact, they are both extremely violent explosives."

The court inquired: "The fulminate of mercury, or whatever the other term is, is the explosive propellant, is that correct, sir? I mean, the explosion causes whatever else is in that cap

to be propelled?" Donahue said that was correct. The court pursued the matter. Donahue answered "yes" to the question, "Now, that explosive causes whatever is in there to be propelled?" The transcript reads:

> ". . . . Now, that which is in there, not the explosive itself, but whatever content the cap has, when the explosion takes place, and that is propelled, is that destroyed upon contact, do you know?
>
> THE WITNESS: Do you mean the chemical preparation?
>
> THE COURT: Yes.
>
> THE WITNESS: Is that destroyed on contact with the individual it strikes?
>
> THE COURT: Yes, sir, or whatever it may strike.
>
> THE WITNESS: It possibly will go into a solution. But that I do not know. I know that the gas is a highly irritant property; whether it's destroyed or not I do not know."

### THE LAW

The General Assembly, concerned with the increase of crimes of violence, took action by enacting ch. 13, Acts 1972, adding new sections 36B-36F, entitled "Handguns", to art. 27 of the Code. In so doing it set out these findings and declarations in § 36B (a) as a "Declaration of policy":

> "(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;
>
> (ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;
>
> (iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens."

Subsection (d) of § 36B provided:

"Any person who shall use a handgun in the commission of any felony or any crime of violence as defined in § 441 of this article,[3] shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor, be sentenced to the Maryland Division of Correction for a term of not less than five nor more than fifteen years, and it is mandatory upon the court to impose no less than the minimum sentence of five years."

Section 36F (a) defined "handguns":

"The term *'handgun'* as used in this subheading shall include any pistol, revolver, or other firearm capable of being concealed on the person, including a short-barreled shotgun and a short-barreled rifle as these terms are defined below, except it shall not include a shotgun, rifle or antique firearm as those terms are defined below."

In *Todd v. State,* 28 Md. App. 127, 135 (1975), we found it to be the legislative intent in the "Handguns" statute "to include any hand weapon simulating the appearance of a pistol or revolver that is capable of discharging a missile by

---

**3.** Sections 441-448 of art. 27, are under the title "Pistols". Section 441 concerns definitions. By subsection (e) "The term 'crime of violence' means abduction; arson; burglary, including common-law and all statutory and storehouse forms of burglary offenses; escape; housebreaking; kidnapping; manslaughter, excepting involuntary manslaughter; mayhem; murder; rape; robbery; and sodomy; or an attempt to commit any of the aforesaid offenses; or assault with intent to commit any other offense punishable by imprisonment for more than one year." The crime of violence Howell and Kaschenbach were accused of committing was a felony. Code, art. 27, § 12.

any method of propulsion." We believed that legislative use of the word "handgun" rather than the more restrictive word "firearm" was a matter of deliberate choice. *Id.*, at 138. In reaching the finding in *Todd*, we looked to the American Heritage Dictionary of the English Language (1973) for the following definitions:

> *Gun* — A weapon consisting essentially of a metal tube from which a projectile is fired at high velocity into a flat trajectory. A device that shoots a projectile.
>
> *Handgun* — A firearm that can be used with one hand; a pistol.
>
> *Firearm* — Any weapon capable of firing a missile, especially a pistol or rifle using an explosive charge as a propellant.
>
> *Missile* — Any object or weapon that is fired, thrown, dropped or otherwise projected at a target; projectile.

The same dictionary states that a "pistol" is "A firearm designed to be held and fired with one hand." It defines "projectile" as "A fired, thrown, or otherwise projected object, such as a bullet, having no capacity for self-propulsion." Webster's Third New International Dictionary of the English Language, Unabridged (1968) gives as a meaning of projectile "a body projected by external force and continuing in motion by its own inertia." It illustrates a use of the word: "subatomic particles used as projectiles in atom smashing." It sets out as a "specific" definition, "a missile for a firearm, cannon, or other weapon." It defines missile as "a weapon or other object thrown or projected (as a stone, bullet, or artillery shell)." "Weapon" has been judicially defined in Maryland. In *Bennett v. State*, 237 Md. 212, 214-215 (1964), the Court of Appeals adopted the language of 3 *Wharton's Criminal Law and Procedure* (Anderson's ed., 1957), § 961, p. 111, stating that a weapon "is generally defined as anything used or designed to be used in destroying, defeating, or injuring an

enemy, or as an instrument of offensive or defensive combat."

## DECISION

In *Todd*, it was manifest that the weapon propelled a projectile, and the issue turned on the nature of the propellant.[4] In the case *sub judice*, it is manifest that the propellant was an explosive charge, and the issue turns on whether the weapon propelled a projectile. The evidence adduced was legally sufficient to show, in light of the definitions above set out, that the weapon here propelled projectiles, and the expert witness so testified. "Tear gas", he explained, "is a rather large quantity of very fine particles, it's not actually a gas at all. And to fire it, firing would expel these *projectiles*, which are very highly irritating to the eyes." [5] (emphasis added). We think that the size of the projectile is of no moment. Whether it be as big as an artillery shell or as small as a subatomic particle, it is still a projectile.

That the weapon in question was a gun is plain. That it may be carried and used in the hand is equally clear; so it was a handgun. It projected an object by means of an explosive force, and it had the appearance of a .22 caliber pistol. We have found that what it propelled were projectiles or missiles. It was capable of inflicting serious injury; "it would be", the expert said, "extremely destructive to an individual's eyes." [6] In short, its characteristics were such as to meet all the requirements of a handgun within the contemplation of the "handgun" statute. We hold that its use in the commission of a felony or a crime of violence as defined by art. 27, § 441 was a misdemeanor proscribed by § 36B (d).

---

4. We said in *Todd*, at 135, that the weapon "was, in short, a handgun unless it was the legislative purpose and intent to have the handgun statute limited in its effect to those hand weapons from which a bullet or missile is ejected by an explosive charge."

5. A tear gas compound may also be in the form of gas or liquid droplets as well as finely divided solids. McGraw-Hill Dictionary of Scientific and Technical Terms (1974).

6. See Training and Operations Manual, Maryland Police Training Commission, (1972), at IV-24 and 25.

Our holding is a narrow one. It is that a weapon, in the form of a pistol [7] which will, or which is designed to, or which may readily be converted to expel, by an explosive force, tear gas in the form of finely divided solids or particles, is a "handgun" within the meaning of art. 27, §§ 36B-36F.[8]

---

7. A "revolver" is a pistol having a revolving cylinder with several cartridge chambers. The American Heritage Dictionary of the English Language.

8. For long past the General Assembly of Maryland has been concerned with the use of dangerous and deadly weapons in the commission of crimes. In 1886 it created the crime of wearing or carrying a weapon concealed upon or about the person or of wearing or carrying it openly with the intent of injuring any person unlawfully. Acts 1886, ch. 375. Although frequently amended, the substance of the 1886 Act remained the same. The Act as amended is now codified as art. 27, § 36. In 1927 a more severe penalty for the common law offense of robbery was authorized when that felony was committed with a dangerous and deadly weapon. Acts 1927, ch. 457, now codified as art. 27, § 488. In 1933 the Legislature enacted the Uniform Machine Gun Act. Acts 1933, ch. 550, codified as art. 27, §§ 372-383, included the declaration that possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence was a felony, § 373, and the possession or use of a machine gun for offensive or aggressive purpose was a penitentiary misdemeanor, § 374. Machine guns must be registered, §§ 378-379. In 1941 the General Assembly regulated the sale, transfer and possession of pistols and revolvers. Acts 1941, ch. 622; Code, art. 27, §§ 441-448. Section 445 (c) proscribed the possession of a pistol or revolver by any person "who has been convicted of a crime of violence, or of any of the provisions of this subtitle or who is a fugitive from justice or a[n] habitual drunkard, or addicted to or an habitual user of narcotics, barbiturates or amphetamines. . . ." Section 445 (b) prohibits the sale or transfer to such person or to "any person under twenty-one years of age as required by federal law." In 1971, the misdemeanor of carrying a deadly weapon upon school property was established. Acts 1971, ch. 614; art. 27, § 36A. It was a year later that the General Assembly, more and more concerned with the increase of crimes of violence, took further action by enacting the "handgun" statute. In 1973, it became a felony under the law of this State for an individual to have certain weapons, whether open or concealed, on or about his person, "while aboard or with intent to board an aircraft engaged in certificated air commerce services." Acts 1973, ch. 334; Code, art. 27, § 36A-1.

These various statutes covered a variety of weapons. The "carrying or wearing weapon" statute, art. 27, § 36, as first enacted, applied to "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever (penknives excepted)." As in effect in 1971 the same weapons were proscribed and "switchblade knife" had been added, the exception being changed to "penknives without switchblade." With the enactment of the "handgun" statute in 1972, "pistol" was eliminated and "handguns" were excepted. By Acts 1974, ch. 718, "nunchaku", defined as "a device consisting of two pieces wood, metal, plastic, or other like substance connected by any chain, rope, leather or other flexible material not exceeding 24 inches in length" was added. § 36 (a) and (b). As now in effect, "handguns" are without the ambit of the "carrying or wearing weapon" statute. When the

Kaschenbach asks if the trial court abused its discretion in denying the motion for a new trial "where the evidence clearly reveals that the State had failed to show that a tear-gas gun is a handgun under Article 27, Section 36B (d)?" Our holding that the weapon here was a handgun in the contemplation of the statute is dispositive of the question.

Howell also urges that the court below erred in deciding that a tear gas gun is included under the handgun statute. Under our holding the court did not err.[9]

---

Legislature excluded pistols and other handguns from the provisions of the "carrying or wearing weapon" statute, it included in § 36B, provisions comparable to those in § 36. In addition to making it a felony to use a handgun in the commission of crime by § 36B (d), the statute, by § 36B (b) made it a misdemeanor for any person to wear, carry, or transport any handgun, whether concealed or open, upon or about his person, or to wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State. Punishment for first and subsequent offenses were set out in § 36B (b) (i), (ii), (iii) and (iv). Exceptions were provided in § 36B (c).

Neither the statute authorizing a greater penalty for robbery committed with a dangerous and deadly weapon nor the "carrying or wearing weapon" statute defined "dangerous and deadly weapon." Judicial decision has defined "weapon", as we have indicated, as anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat. Bennett v. State, *supra*, 214-215. It is necessary to show, however, that the weapon is dangerous or deadly, Vincent v. State, 220 Md. 232 (1959), proof of either being sufficient, Bell v. State, 5 Md. App. 276 (1968). See Hayes v. State, 211 Md. 111 (1956). The character of a weapon as dangerous or deadly is not necessarily determined by its design, construction, or purpose. It is when a weapon is in fact used in such a way as is likely to produce death or grievous bodily harm, that it may properly be regarded as a dangerous or deadly weapon. Bennett v. State, *supra*. A knife may be either a deadly or only a dangerous one, depending on the size of the blade and the manner of its use. Bell v. State, *supra*. A "gravity knife" has been held to be a dangerous and deadly weapon. Savoy v. State, 236 Md. 36 (1964). A microphone cord on a taxi radio may be a dangerous weapon. Bennett v. State, *supra*. An unloaded pistol is at least a dangerous weapon. Hayes v. State, *supra*; Wallace v. Warden, 226 Md. 670 (1961). A starter's pistol is a dangerous weapon, Jackson v. State, 231 Md. 591 (1963), as is a gun fully loaded but not fireable, Myers v. State, 237 Md. 632 (1965).

9. Although it is manifest that at the guilt stage of the trial, the judge concluded that the weapon here was a handgun within the ambit of § 36B, the reasons for his conclusion were not readily apparent from the transcript of the trial. He had no doubt that it was "a dangerous and deadly weapon", referring to Hayes v. State, 211 Md. 111 (1956), but the problem was whether there was any authority that the legislature included in "the generic term handgun", starter pistols, cap pistols or a tear gas gun. Although the weapon was "a gas pistol and not an honest to heavens Jesse James pistol", he ruled that it was a handgun under the statute.

In denying the motion for a new trial, the court was more specific. It

We give a caveat. It necessarily follows from our holding that a weapon of the type which is the subject of this opinion comes under all of the provisions of the handgun statute. Such a weapon is, therefore, subject not only to the proscriptions against unlawfully wearing, carrying, or transporting a handgun, § 36B (b), and unlawfully using a handgun in the commission of certain crimes, § 36B (d), but also to the provisions requiring a permit to carry a handgun, § 36E. We point this out because there is indication in the record before us that at the present time those charged with issuing handgun permits take the view that a permit is not required to carry such a weapon.

## II

Howell, whose appeal goes to the propriety of the judgments against him, also questions the sufficiency of the evidence to sustain each conviction.

accepted an opinion of the Attorney General, 58 O.A.G. 572, 576 (1973), which found it "abundantly clear that the term handgun as defined in Section 36(F) of Article 27 of the Annotated Code of Maryland covers the same weapons as contemplated in the 'Gun Control Act of 1968', codified at 18 U.S.C. 921 (3). The Gun Control Act of 1968 defines firearm as '. . . any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.' . . . There can be no question but that the definition of firearm contained in the Gun Control Act of 1968 contemplates and includes the definition of a handgun under the Maryland Statute." The court observed that the testimony of Donahue was that the weapon here "could not be corrected to expel a projectile by the action of an explosive, other than any projectile which it was already designed to expel." The court discussed "projectile", and found that the weapon in question fell within the definition of a device "designed to expel a projectile by the action of an explosion." The court made an alternative finding, that the weapon fell within the definition of "any destructive device" set out in subsection (D) of the federal statute. "Because the testimony before the court, and common sense, tell us that this device, if used in close proximity to the skin or the eyes, would have a certain destructive effect. . . ." The court continued: "So that under either approach it is the court's opinion that this device falls within the definition as set forth by the Legislature, and certainly falls within the contemplation of the Legislature at the time of the passage of this Bill. In other words, the court is holding as a matter of law that the Legislature, through its language, had the legislative intent to include within the prohibition contained in Article 36 [B] devices such as the State's exhibit in this case."

We need not, and do not now, determine whether the Maryland handgun statute covers the same weapons included in the federal Gun Control Act of 1968.

*The Conviction of Assault with Intent to Rob*

The testimony of Clough was legally sufficient to establish the *corpus delicti* of an assault with intent to rob him as charged, and Howell does not argue to the contrary. Howell attacks the proof of his criminal agency, claiming that "the identification in this instant case was questionable and not believeable." We observe that Clough made a positive judicial identification of Howell as one of the felons. This was enough in law for the trier of fact to find the criminal agency of Howell. The allegations of Howell that the lighting at the time of the commission of the crime was poor and that Clough was uncertain in an identification at an initial confrontation, go only to the weight to be given the judicial identification. We note that in addition to the positive judicial identification of Howell, he was apprehended shortly after the commission of the crime in the proximity of the car stolen from Clough, that he fit the description given by Clough to the police, that he was in the company of another who fit the description of the second felon, and that a weapon answering the description of the weapon used in the crime was found at Howell's feet when he was accosted by the police. We hold that the court was not clearly erroneous in its judgment that Howell was a criminal agent in the assault with intent to rob. Maryland Rule 1086; *Williams v. State*, 5 Md. App. 450 (1968).

*The Conviction of the Use of a Handgun*

At the trial Clough identified Howell as the person who "pulled a gun out, and stuck it up to my head, and asked me if I had any money. . . ."[10] This evidence was legally

---

10. Clough was requested by the prosecutor "to leave the witness stand, come right down into this part of the courtroom, and I want you to look around carefully, and see if you can identify in the courtroom today anyone whom you saw on that night that this robbery took place." Clough identified two persons. The transcript reads:

"A. One is sitting in the back, all the way to the right.
    THE COURT: Go back and put your hand on him.
    THE WITNESS: This one right here.

sufficient to sustain the conviction of Howell of the misdemeanor of using a handgun in the commission of a felony. *Broadway v. State,* 23 Md. App. 68, 75-80 (1974); Code, art. 27, § 12; *Williams v. State, supra.* The trial court was not clearly erroneous in its judgment that Howell was guilty as charged under the third count of the indictment. Rule 1086.

> *As to Leonard Francis Kaschen-*
> *bach, Jr.: order denying motion*
> *for a new trial affirmed.*
> *As to Lowell Douglas Howell,*
> *Jr.: judgments affirmed.*
> *One-half costs to be paid by*
> *Leonard Francis Kaschenbach,*
> *Jr.*[11]

*Lowe, J., dissenting:*

In 1928 Mr. Justice Charles Evans Hughes pointed out that judges are constantly sustaining the validity of legislation which as legislators they would probably

---

> MR. TOWNSEND [Assistant State's Attorney]: Indicating the young man in the green check jacket and the white tie.
> THE WITNESS: This one right here.
> Q. (BY MR. TOWNSEND): Can you tell the court which one was the one that held the gun on you?
> A. Right here.
> THE COURT: Did you identify two people back there, I couldn't see?
> THE WITNESS: Yes, sir, this one right here and right there."

At the request of the court the two persons whom Clough identified stood and gave their names. They were Howell and Kaschenbach. But the record does not reflect, at this point, which of the two was the one who held the gun. We have cautioned before that care should be taken to have the record properly show what was obvious to those present. That the man who held the gun is "Right here", does not tell the reader of the record who the man is. Fortunately, the matter was cleared up in the record on cross-examination of Clough. Howell's attorney stated in examining Clough: "You have told the court that Lowell Howell, this tall boy, is the one who held the pistol."

11. Howell, as an indigent, applied to the Public Defender for assignment of counsel to represent him on appeal. The appearance of an assigned public defender to represent him was entered. Kaschenbach was represented on appeal by privately retained counsel.

condemn. That is within the judicial aegis and our proper function. We exceed that function when we extend the scope of legislatively proscribed activities to include that which the legislature "might" have meant to proscribe, but did not clearly so indicate.

Most laws, by their nature, curtail activities that, but for the law, would be accepted and continued as a matter of right. It is my view that, when our lawmakers restrict these rights in an effort to accommodate the needs of contemporary society, the restriction should be limited to that which is clearly stated without additional limitations being placed upon the activities of our citizens by our judicial interpretation of what we believe the lawmakers *might have intended* to include. This should be so without regard to our opinion of the activities restricted.

I raised no dissent in *Todd v. State*, 28 Md. App. 127, but my silence was maintained with some trepidation when I considered how far the language of that opinion might carry us. The journey is already upon us. There, as pointed out by the majority here, we found it to be the legislative intent in enacting Sections 36A through 36F of Article 27,

" . . . to include any hand weapon simulating the appearance of a pistol or revolver that is capable of discharging a missile *by any method of propulsion*." (Emphasis added).

I can at least question the correctness of our decision in *Todd*; I do dissent from our decision here.

Whatever our own view of the propriety of outlawing tear gas guns may be, it can play no part in our interpretation of the intent of the Legislature in enacting its handgun proscription. "We must not be guilty of taking the law into our own hands, and converting it from what it really is to what we think it ought to be." *Rex v. Ramsey*, 1 C & E 126, 136.

In interpreting the statute in *Todd*, we sought the intent of the Maryland Legislature by referring to the New York Supreme Court Appellate Division, 1st Department, the

Municipal Court of Appeals for the District of Columbia, the Court of Criminal Appeals of Oklahoma and *The American Heritage Dictionary of the English Language.* In extending our interpretation of the Maryland Legislature's intent to include tear gas as a projectile, we now have rung in *Webster's Third New International Dictionary of the English Language Unabridged.*

If tear gas consists of projectiles as declared by the majority, so even more does the wadding of a blank cartridge starter pistol since the black powder residue will penetrate the skin when fired in close proximity thereto. Reasoning from the sublime to the ridiculous, we couple *Todd*'s interpretation of "any method of propulsion" to the majority's view of a projectile and conclude that a water pistol falls more readily within the judicial definition of a handgun than does a tear gas gun. While the majority assumed the projectile must be capable of inflicting injury, we find no such requirement in the statute.

Both in *Todd* and here, the majority relied upon the "Declaration of policy" prefacing the statute in question. That declaration said in effect that the "substantial increase in the number of persons killed or injured" is traceable to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity. The restriction placed upon "wearing, carrying and transporting handguns" was intended to reverse that trend. Nowhere do I find indicia of legislative intent therein indicating that the General Assembly meant to include in that restriction air guns or tear gas pistols.

It seems to me that the facts of both *Todd* and the instant case are indicative that the legislation is effective, if only to a limited degree. When criminals resort to air pistols (*Todd, supra*) and tear gas guns, the danger of death and serious injury in the perpetration of crime is greatly lessened. The declaration of policy indicates (to me) that since we cannot find the means to stop crime absolutely, the danger of death or injury from the commission thereof with a handgun will be made more difficult and especially onerous, toward the

end that life and limb may be preserved while we continue to seek the solution to the preservation of property as well.

In addition to the declaration of policy, the majority finds sustenance in the Legislature's choice of the term "'handgun' rather than the more restrictive word 'firearm' . . . ." I agree that this wording was a "matter of deliberate choice; " however, I cannot agree that "firearm" is more restrictive than "handgun." By the majority's own definition, taken from *The American Heritage Dictionary of the English Language* (1973), a "firearm" is *"[a]ny weapon* capable of firing a missile." (Emphasis added). That term includes long arms as well as handguns and long arm inclusion in the handgun law was clearly not the legislative intent. "Firearms" may be more restrictive as to the means of propulsion; however, it does not restrict the type of projectile.

Common sense (for which I cannot cite judicial authority) leads me to conclude that if the Legislature intended to proscribe the "carrying, wearing or transporting" of tear gas, it would have done so, not only when carried in the shape or form of a "handgun" but in whatever other form it may take, such as a fountain pen, cosmetic compact, cane or other such container purchasable as a weapon of self defense. It is inconceivable that the Legislature would subject a person to imprisonment merely because of the shape of the tear gas container he carried and not do so to another carrying an equally dangerous but differently shaped container. I have taken the liberty of assuming that the majority would be willing to accept a restriction on their definition requiring that the shape of a handgun should at least resemble a "pistol, [or] revolver," if not under the maxim "noscitur a sociis," since those descriptive terms are used in the definition in § 36F, then by their express reference thereto in the "narrow holding." See p. 10 of majority opinion. Without that shape restriction, a permit would be required to transport aerosal bombs and shaving cream dispensers.

Even more does my unauthoritative common sense lead

me to the conclusion that the term "projectile" upon which the majority opinion turns (spoken of in one of the dictionary definitions), should be viewed in the context of its use, *i.e.*, that which is fired from a handgun. We are hard pressed to reach a result when we must consider sub-atomic gaseous-like particles as projectiles in the same category as the bullet in a cartridge or the shot in a shell. The majority's opinion of the Legislature's intent to include tear gas guns is supported entirely by a semantic foundation of lexical morphemes.

It is my opinion that if the General Assembly wishes to create the crime of transporting tear gas weapons or add a mandatory penalty for using them to perpetrate a crime, it should say so in a clear enough manner that we need not seek its intent in New York, Oklahoma, the District of Columbia or scattered among proliferate terms in various dictionaries.

I respectfully dissent.