470 A.2d 361

Sheldon Savior BALL and Joseph Melvin Wright and Kenneth D. Coley

v.

STATE of Maryland.

No. 75, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Feb. 2, 1984.

342

Mark Colvin, Assigned Public Defender, for Wright; John Kopolow, Asst. Public Defender, for Coley; Clarence W. Sharp, Assigned Public Defender, for Ball; with whom was Alan H. Murrell, Public Defender of Maryland on all the briefs.

Jillyn K. Schulze, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen. of Maryland, Kurt Schmoke, State's Atty. for Baltimore City, and James Maggio, Asst. State's Atty. for Baltimore City on the brief, for appellee.

Argued before MOYLAN and WILNER, JJ., and MORTON, JAMES C., Jr. (Ret.), Specially Assigned Judge.

MOYLAN, Judge.

The appellants, Sheldon Savior Ball, Joseph Melvin Wright, and Kenneth D. Coley were jointly tried by a Baltimore City jury, presided over by Judge Robert I.H. Hammerman, for murder, attempted armed robbery, and related offenses. The appellant Wright was convicted of 1) felony-murder, 2) the use of a handgun in the commission of

a felony, and 3) the unlawful carrying of a handgun. He was sentenced to life imprisonment. The appellant Coley was found guilty of felony-murder and sentenced to life imprisonment, an indefinite fifteen years of which sentence were suspended. The appellant Ball was found guilty of 1) murder in the second degree, 2) the use of a handgun in the commission of a crime of violence, and 3) the possession of a handgun. He was sentenced to thirty years on the murder conviction and fifteen years on the use of the handgun in a crime of violence, the two sentences to be served consecutively.

The appellants Wright and Ball both raise the following contention:

1. That the trial judge committed reversible error when he refused to sever their trials from each other and from the trials of the appellant Coley and another codefendant, Dwight Gilmore;

The appellants Wright and Coley both raise the following contention:

2. That the trial judge erred by refusing to instruct the jury that felony-murder is murder in the first degree;

The appellant Ball alone raises three other contentions:

3. That the evidence was not legally sufficient to sustain his convictions;

4. That he was denied a fair trial by the prejudicial nature of the State's closing argument; and

5. That the trial judge erroneously admitted an excised statement given by codefendant Coley; subsequently admitted the same statement with the names disclosed; and refused to permit the appellant Ball to cross-examine his codefendant, Kenneth Coley.

The appellant Coley alone raises six separate contentions:

6. That the evidence was not legally sufficient to sustain his conviction for felony murder;

7. That the trial judge erroneously refused to suppress his extrajudicial confessions;

8. That the trial judge erroneously refused to allow him to cross-examine Sergeant Brandner as to what the Assistant State's Attorney told the appellant prior to the execution of the plea agreement;

9. That the trial judge erroneously refused to permit defense counsel in closing argument to read a principle of law from a Court of Appeals opinion;

10. That the trial judge erroneously instructed the jury that the appellant's testimony was given freely and voluntarily; and

11. That he is entitled to be resentenced because the sentence imposed is vague and indefinite.

The appellant Wright alone raises two additional contentions:

12. That the trial court erred in accepting a verdict of guilty on the charge of using a handgun in the commission of a felony or a crime of violence, where the verdict sheet indicated that the jury had acquitted him of that offense; and

13. That his trial and conviction for felony-murder and for the use of a handgun in the commission of a felony were barred by the protection against double jeopardy.

### Contentions 3 and 6:
### Legal Sufficiency of the Evidence

We will consider first the respective claims of the appellants Ball and Coley that the evidence was not legally sufficient to sustain their various convictions. The contentions are literally absurd. The evidence established indisputably that, on the morning of February 19, 1982, Henderson McInnis, a security guard at the A & P Supermarket on Frederick Avenue, was shot and killed in the course of an attempted armed robbery. As to the *corpus delicti* of the crime, Charlotte Locklear, a clerk at the A & P, testified that, shortly after 9 A.M., "three guys were up by the guard and I guess they were talking, and then I heard a bang go

off . . . and then I heard another one go off and then I hit the floor and then I heard two more go off." The witness testified that the men were wearing masks and ran toward Frederick Avenue after the shots were fired.

Another witness to the crime was a customer in the store, Cecilia Kasper. She testified that "three boys came in and the guard walked towards them and they shot him." She testified that the men wore masks and ran toward Frederick Avenue as soon as the shooting occurred.

Dwight Woods also testified as to the *corpus delicti.* He stated that he was walking toward the A & P store in question, when he saw, for "just a second," "two guys run across Frederick Avenue towards Catherine with dark blue clothing." He made in-court identifications of the appellant Wright and the codefendant Gilmore as the two men he saw running.

Another witness in the A & P store was Chico Young, who was in the store to talk to the security guard about repairing a television set. Young described the shooting as follows:

"And when the store opened at 9:00 o'clock . . . while I was in there, I had to wait to see him because four black boys was there talking to him and before I get a chance to talk to the man, there was some shooting . . . All I saw was the young man in a light trenchcoat take a revolver from his coat pocket and fire upon the security guard . . . They came running out."

He testified that two of the men ran in one direction and two, in another direction. Mary Wilson, the head cashier in the store, also testified that she heard four or five shots but saw nothing.

The establishment of the criminal agency of Ball and Coley began with the testimony of Marcus Taylor. He testified that he "grew up" with all four of the defendants, Wright, Ball, Coley, and Gilmore. On the day of the robbery, Taylor stated that he saw all four of them run by him, put masks on, and enter the A & P store. Shortly after

that, he heard "a couple of shots." He then saw the same four run out of the store toward Frederick Avenue.

With respect to the criminal agency of the appellant Ball specifically, Angelo Frazier testified that he was incarcerated for a time in close proximity to both Ball and the codefendant Gilmore. On March 23, 1982, while in a Central District lockup, Frazier heard Gilmore say to Ball, "This is probably the A & P lineup. I can't worry because they can't identify any of us, we had masks on." To that observation, Ball replied, "I know, I ain't worried about it."

With regard to the criminal agency of Coley specifically, Sergeant Gerard Brandner testified as to a statement he took from Coley in which Coley acknowledged that he and his three coconspirators planned to rob the A & P store; that he and one of the codefendants entered the store first; that Ball shot the security guard before the other two codefendants were able to enter the store; that all four men fled immediately; and that all four wore ski masks while in the store.

The appellant Coley, moreover, actually took the stand in his own defense. His trial testimony, in contrast to his earlier statement, shifted the identity of his three co-conspirators from his three codefendants to State's witnesses Marcus Taylor and Dwight Woods and a third individual named Leroy. Although the characters had changed, the plot had not. From his own lips, both extrajudicially and judicially, Coley's guilt was indisputably established.

A. *As to Coley: The Corroboration Requirement*

 The appellant Coley advances the ingenious, albeit strained, argument that the evidence is not legally sufficient to sustain his conviction because it is based upon his own uncorroborated confession. He does not go so far as to argue that there was no corroboration generally, but does argue that the only evidence that the killing was in further-ance of an attempted robbery was evidence that he himself supplied. He reads too much into the requirement that a

defendant cannot be convicted upon his confession alone but that there must be some independent evidence, although it need only be slight, tending to establish the *corpus delicti* of the crime. The salutary purpose of this particular corroboration requirement is to prevent a mentally unstable person from confessing to, and thereby being convicted of, a crime that never occurred. *Lemons v. State,* 49 Md.App. 467, 469, 433 A.2d 1179 (1981). The requirement that there be some corroborating evidence tending to establish the *corpus delicti* generally, does not establish an independent corroboration requirement as to each component element of the *corpus delicti.*

■ The appellant Coley was, in the last analysis, convicted of murder. There was undisputed independent evidence that the victim, Henderson McInnis, had died of gunshot wounds. Society was amply reassured that the appellant Coley was no mere mental incompetent who had wandered in off the streets to confess to some totally nonexistent crime. *Bagley v. State,* 232 Md. 86, 96, 192 A.2d 53 (1963); *Pierce v. State,* 227 Md. 221, 175 A.2d 743 (1961).

■ Our disposition of the contention on this ground by no means intimates that there was not also independent corroboration, if it were needed, to establish the underlying felonious purpose. When four men enter a commercial establishment, armed and wearing ski masks, a reasonably permitted inference is that their business was robbery. *Miller v. State,* 251 Md. 362, 247 A.2d 530 (1968) *vacated in part on other grounds,* 408 U.S. 934, 92 S.Ct. 2851, 33 L.Ed.2d 747 (1972); *Foster v. State,* 230 Md. 256, 186 A.2d 619 (1962); *Smith v. State,* 20 Md.App. 577, 597, 318 A.2d 568 (1974), *cert. den.* 420 U.S. 909, 95 S.Ct. 828, 42 L.Ed.2d 839 (1975), *reh. den.* 420 U.S. 984, 95 S.Ct. 1416, 43 L.Ed.2d 666 (1975); *Fulford v. State,* 8 Md.App. 270, 273, 259 A.2d 551 (1969).

Our decision, moreover, to treat the contention in this fashion because of the abundance of corroboration does not intimate that we necessarily feel that this corroboration requirement is even applicable when we are dealing, as here,

with in-court testimony acknowledging full guilt rather than with a mere extrajudicial confession.

**B. As to Ball: Evidence of Criminal Agency**

■ The appellant Ball rests his insufficiency argument on a very different predicate, as he urges that the evidence was not legally sufficient to establish his criminal agency. His contention must also fail. We have the confession of Coley that was admitted in evidence without a limiting instruction, giving the name of one of his co-conspirators as "Sheldon." Ball's first name is Sheldon. We have the testimony of Marcus Taylor placing the appellant Ball at the crime scene with his three codefendants, donning ski masks, entering the A & P, and running from the scene immediately after Taylor heard "a couple of shots." We have, moreover, the testimony of Angelo Frazier in the lockup, where he heard Gilmore and the appellant Ball expressing confidence that they would not be identified because they had had masks on. The evidence of ˙ Ball's guilt was abundantly sufficient. *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331 (1970); *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968).

*Contention 1: Trial Severance*

■ We turn our attention to the claim of the appellants Wright and Ball that the trial judge committed reversible error when he refused to sever their trials from each other and from the trials of the appellant Coley and the codefendant Dwight Gilmore. The claim rests upon two items of evidence: 1) the confession of Coley and 2) the conversation between Gilmore and Ball overheard by Angelo Frazier. With respect to the confession of Coley, what might have been a problem under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), disappeared when Coley took the stand and became available for cross-examination. *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *Lipscomb v. State,* 5 Md.App. 500, 506, 248 A.2d 491 (1968). There is no constitutional confrontation problem when one's accuser is ultimately available for confrontation.

As was explained in R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1983) at 584–585:

"In 1971, the case of *Nelson v. O'Neil* dealt with a situation, like that in *Bruton,* where two codefendants were on trial. A codefendant's statement was introduced against O'Neil. In contrast to the *Bruton* situation, however, the codefendant took the stand and was therefore available for cross-examination by O'Neil. The Supreme Court held that this fully satisfied O'Neil's right to confront the witness against him. It held this, notwithstanding the fact that O'Neil's lawyer did not exercise the right to cross-examine and notwithstanding the fact that the codefendant denied ever having made the statement in question."

██ There was simply nothing in this regard remotely calling for a trial severance. A severance is called for only when a defendant will be significantly prejudiced by evidence admissible against a codefendant but not admissible against him. As Judge Liss fully explained for this Court in *Sye and Bates v. State,* 56 Md.App. 583, 468 A.2d 641 (1983):

"In pointing out that prejudice consists not of being damaged or incriminated by the evidence in issue but only of being damaged or incriminated by evidence that is inadmissible, we observed that what was involved was the classic problem dealt with by the Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). At a joint trial of two codefendants, one codefendant may indeed be prejudiced by the admission into evidence of a confession given by the other codefendant. The prejudice consists of hearsay evidence being heard by the jury which would not be admissible if the objecting defendant were to be tried alone. Where the codefendant who gives the damaging version actually takes the stand and testifies, however, there is no problem. The testimony, though damaging to be sure, is competent and, therefore, admissible. Prejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence."

**354**

■ The other item of evidence under scrutiny within the context of this contention was the overheard station house conversation between Gilmore and Ball and testified to by Angelo Frazier. The appellant Ball is simply off base when he refers to this as a damaging admission by Gilmore which should not have rubbed off on Ball. It was clear that both Ball and Gilmore were in full agreement with the remarks made by each other and that Ball adopted Gilmore's initial statement and affirmed that it was his position as well. If Ball had been tried alone, the testimony of Angelo Frazier would have come in just as it did at the consolidated trial. The appellant Ball had no remote entitlement to a trial severance.

■ The appellant Wright, on the other hand, was not a party to the station house conversation and that conversation might well not have been admissible in a trial of Wright alone. In weighing the significance and impact of the testimony, however, we note initially that the conversation did not implicate the appellant Wright and did him no damage in any direct sense. The direct evidence of the appellant Wright's guilt, on the other hand, was overwhelming, and we are persuaded beyond a reasonable doubt that even if the overheard conversation was erroneously admitted at his trial, the effect was *de minimis* and the error harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

*Contention 2: The Jury Instruction on the Various*
*Forms of Murder*

Both the appellants Wright and Coley raise the contention that Judge Hammerman committed error by refusing to give a supplemental instruction to the jury, after the jury had returned to the courtroom to ask a question on another subject, informing the jury that felony-murder is murder in the first degree. With respect to the appellant Coley, we shall address the merits of the contention; with respect to the appellant Wright, we shall not.

## A. *As to Coley: On the Merits*

During closing argument, the prosecuting attorney told the jury that felony-murder is first-degree murder. There was no apparent problem in that regard. There was no real issue in the case as to varying gradations of blameworthiness and the whole matter of definition was not a subject of particular concern in the minds of any of the parties. Judge Hammerman defined first-degree murder of the deliberate and premeditated variety, denominating it as first-degree murder. By way of contrast, he defined murder in the second degree as involving the same elements, save only the deliberation and/or premeditation. He then gave a perfectly proper definition of felony murder, spelling out all the necessary elements that had to be proved by the State. The only thing he did not do was to give this crime its label as "first-degree murder." After his jury instructions were given, all counsel came to the bench and various exceptions were noted. No one took exception to the fact that the court did not explicitly explain to the jury that felony murder is first-degree murder. As of that stage, therefore, there is nothing before us preserved for appellate review. Md.Rule 757 f.

At one point in its deliberations, however, the jury came in and asked the following question, "Should all four men be found guilty of the same offense or can we charge each one differently?" There was no objection to the response the judge proposed to make to that question. It was at that point that counsel for Coley made the additional request, "I would also request that you explain to the jury that felony murder is first-degree murder." At that point, the codefendants Ball and Wright strenuously objected to this request by Coley. In view of these objections and because of the fact that the additional instruction was not responsive to the jury's question, the trial judge exercised his discretion by failing to give the supplemental instruction. We see no abuse of discretion.

 Although it is common knowledge that juries sometimes do more than they are charged with doing, it is not ordinarily the function of the jury to adjust or compromise verdicts in order to influence sentencing. The jury's mission is fact finding, pure and simple. The judge accurately instructed the jury as to all elements that would have to be proved to permit a finding of felony-murder. The jury found that those elements had been proved, and they accordingly rendered a verdict of guilty as to felony-murder.

 What "sticks in the craw" of the appellant Coley is obvious and his concern is understandable. The triggerman was apparently his codefendant Ball. The sequence in which the three forms of murder were explained may have led to an inference that they were in descending order of blameworthiness. The jury may well, intending to punish the codefendant Ball even more severely, have unwittingly given him the benefit of a mere second-degree conviction. Every legitimate "gripe," however, is not necessarily an occasion for legal relief. The nub of Coley's complaint is not that he did not richly deserve the verdict he received but rather that his codefendant Ball *did not deserve* the unintended leniency he received. That, even if true, does not entitle the appellant Coley to relief. The jury was fully informed as to all of the elements constituting the crime of which it found the appellant Coley guilty. No other knowledge was necessary to its literal fact-finding mission.

What clearly is involved is an inconsistency in the verdicts that redounded to the undeserved benefit of the codefendant Ball. The Supreme Court recently addressed the subject of inconsistent verdicts in *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530, 535–536 (1981):

"Inconsistency in a verdict is not a sufficient reason for setting it aside. We have so held with respect to inconsistency between verdicts on separate charges against one defendant, *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 ALR 161 (1932), and also with respect to verdicts that treat codefendants in a joint trial incon-

sistently, *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943)."

In *Harris v. Rivera, supra,* the beneficiary of the apparent error did not receive merely a lighter verdict but an actual acquittal. In holding that a bizarre and eccentric result acquitting one defendant will not erode the validity of the otherwise proper convictions of other defendants, the Supreme Court held, at 454 U.S. 344, 102 S.Ct. at 463:

> "[E]ven if the acquittal rests on an improper ground, that error would not create a constitutional defect in a guilty verdict that is supported by sufficient evidence and is the product of a fair trial."

The appellant Ball got an unintended and undeserved "lucky break." The aggrieved party in that respect is the State; the State, however, may not appeal. That does not entitle everyone else to a similar "lucky break."

That even erroneous leniency for one does not compel erroneous leniency for all was the unmistakable conclusion of the Supreme Court, at 454 U.S. 347, 102 S.Ct. at 465:

> "It is also possible that the judge may have made an error of law and erroneously assumed, for example, that Robinson should not be found guilty without evidence that he was to share in the proceeds of the larceny. There is no reason—and surely no constitutional requirement—that such an error pertaining to the case against Robinson should redound to the benefit of respondent."

We address the legitimacy of the verdicts as to each co-defendant in a vacuum. We ask only that the instructions have been proper and that the evidence have been legally sufficient. This was so in the case of the appellant Coley. We hold, therefore, even as the Supreme Court held in *Harris v. Rivera, supra,* at 454 U.S. 348, 102 S.Ct. at 465:

> "Apart from the acquittal of Robinson, this record discloses no constitutional error. Even assuming that this acquittal was logically inconsistent with the conviction of respondent, respondent, who was found guilty beyond a

reasonable doubt after a fair trial, has no constitutional ground to complain that Robinson was acquitted."

### B. *As to Wright: Waiver*

■ The same contention as raised by the appellant Wright will receive far shorter shrift. As we pointed out above, there were no objections to the definitions of the various varieties of murder when the jury was originally instructed. It was only when the jury returned to the courtroom with a question on another subject, that counsel for Coley made the request that the jury be given the supplemental instruction that felony-murder is murder in the first degree. It was at that point that the appellant Wright leaped up to protest strenuously against the giving of the requested supplemental instruction. At least in part because of the strong objection by Wright, Judge Hammerman in his discretion declined to give the supplemental instruction. It is with exceeding ill grace that the appellant Wright now complains about the very treatment which he then insisted upon. Deeming him to have waived utterly any objection in this regard, we decline even to consider the merits of the contention as raised by him.

### *Contention 4: The Closing Argument of the State*

■ We next turn to the appellant Ball's contention that he was denied a fair trial by the nature of the State's closing argument. While on the merits we would have no difficulty in finding no prejudicial error, *Wilhelm v. State,* 272 Md. 404, 412–413, 326 A.2d 707 (1974), a more direct answer to the contention is procedural. When the appellant Ball objected to the State's argument that the appellant Coley was afraid of his three codefendants, the court sustained the objection. Nothing more was requested. The appellant Ball did not ask for a curative instruction. The appellant Ball did not move for a mistrial. It would certainly have been the height of irresponsibility for the trial judge to have declared a mistrial *sua sponte,* whether the appellant wanted one or not. *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547,

27 L.Ed.2d 543 (1971). The same thing occurred when the appellant Ball objected to what he deemed to be an oblique reference to the fact that he had not taken the stand. The objection was sustained. In a nutshell, the appellant Ball got everything he asked for. This is not error.

■■ The very framing of this contention illustrates for the thousandth time the epidemic fuzziness of so much recent appellate rhetoric. "Error" is a precise term of art in the appellate context. No matter how reprehensible their conduct, trial attorneys, civil or criminal, for the State or for the defense, cannot, by definition, commit error; their conduct can do no more than serve as the predicate for possible judicial error. As Judge Powers carefully and thoughtfully analyzed for this Court in *Braun v. Ford Motor Company*, 32 Md.App. 545, 548, 363 A.2d 562 (1976):

> "*We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge.* It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. *Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.*" (Emphasis supplied).

■■ Aside from his undifferentiated anguishing, the appellant Ball gives little guidance as to what precisely he wanted the judge to do. He, of course, never requested that the judge do anything. Even now, he does not suggest that the judge, *sua sponte,* should have given curative instructions. The final sentence of this vague and blurred complaint simply suggests, without citation of authority, that the comments of the prosecutor were such as to have "created the manifest necessity for the trial court to grant a

mistrial and the failure to do so constituted an abuse of discretion mandating reversal." Several observations must be made. In the first place, a judge cannot abuse his discretion when he is not called upon to exercise discretion. In the second place, the very notion of "manifest necessity" is pertinent, as an exemption from the double jeopardy bar, only in the context of a mistrial's having been declared at the request of or, *sua sponte,* on behalf of the State. When a mistrial is even contemplated for the benefit of a defendant, the defendant has the final choice of whether he wishes such a mistrial or not. The very value protected by this subvariety of double jeopardy law is the right of a defendant "in keeping together a tribunal, once it is impaneled, until a verdict has been reached." *West v. State,* 52 Md. App. 624, 451 A.2d 1228 (1982). If a defendant chooses to stick it out to the sweet or bitter end, that is his choice. If the defendant desires a mistrial, he must manifest that desire by asking for it.

As part of the unfocused discussion of when mistrials might be appropriate, the appellant Ball cites *Holbrook v. State,* 6 Md.App. 265, 250 A.2d 904 (1969), and *James v. State,* 31 Md.App. 666, 358 A.2d 595 (1976). He conveniently ignores the salient, threshold fact that those opinions were in the context of defendants' having asked for mistrials. Mistrials are simply not thrust upon unwilling defendants who do not wish them.

### Contention 5: The Statement of the Codefendant Coley, Excised and Unexcised

The appellant Ball's final contention is that error was committed as to him through the admission of the statement of the co-appellant Coley. As to the voluntariness of Coley's confession and its admissibility in the first instance, this is a personal constitutional concern of Coley and the appellant Ball has no standing to raise the issue. Ball's next argument with respect to the confession is that the initial excision of the names of Coley's three codefendants was not adequate to prevent the jury from drawing

reasonable inferences as to whose names should logically fill those blanks. Subsequent developments, however, rendered this contention moot. Coley took the stand and implicated three other persons. The State was then permitted to resubmit Coley's confession with the names of his three codefendants fully exposed. The appellant Ball does not challenge the propriety of that procedure. That procedure, unchallenged, makes his present contention meaningless.

 His final subcontention with respect to Coley is that he was erroneously denied the opportunity to cross-examine Coley with respect to any plea agreement that Coley may have had with the State after the acknowledged plea agreement of March 1, 1982. What eventuated, however, was that the appellant Ball wanted to examine Coley about an offer made by the State on the day immediately preceding the trial, to elicit Coley's testimony in exchange for a plea to attempted robbery and a sentence of probation. Such an offer by the State was obviously not accepted by Coley and was not relevant to show a bias by Coley in favor of the State. The only evidence ultimately emanating from Coley and as to which possible bias might have been relevant was the initial confession of Coley. Events far posterior to the giving of that confession would have no bearing on the trustworthiness of that confession. The proffered cross-examination would have gone to an issue which was immaterial.

This concludes our review of all contentions raised by the appellant Ball.

### Contention 7: The Extrajudicial Confession of the Appellant Coley

The appellant Coley objects to the admission of his pretrial confession. Upon being questioned initially by the police, the appellant was given and waived his *Miranda* rights. He gave the police an exculpatory statement which included an alibi defense. After being informed, however, that he had been implicated by one of his alibi witnesses,

Coley spoke with his mother, who in turn asked to see an assistant state's attorney. She spoke with Assistant State's Attorney Howard Gersh and then went back to consult with her son. Shortly after this, the appellant Coley, his mother, and Assistant State's Attorney Gersh entered into an oral and then a written plea agreement. He not only gave a statement but agreed to testify for the State. Although he himself later backed out of the plea bargain, the State did not breach the agreement.

The plea agreement itself, dated March 1, 1982, signed by the appellant Coley and by Assistant State's Attorney Howard B. Gersh, and witnessed by one Lorraine Morris, was not only referred to at the trial but was introduced into evidence. It read as follows:

## "PLEA AGREEMENT

The following agreement was entered into this date by and between Kenneth Dywane Coley and Howard B. Gersh, Assistant State's Attorney:

1. That if Kenneth Coley is not the actual shooter of Henderson McInnis,

2. Kenneth Coley agrees to provide a full, complete and truthful statement as to his participation and the participation of all others in the shooting of Henderson McInnis which took place on 19 February 1982 at 2401 Frederick Rd., Baltimore City.

3. Kenneth Coley agrees to testify truthfully before the Grand Jury of Baltimore City as to his participation and the participation of all others in the above noted shooting.

4. Kenneth Coley agrees, if requested by the State, to testify at any hearings or trials involving any participants of the shooting.

It is further agreed that the State of Maryland will accept a plea of guilty to Murder in the Second Degree which carries a maximum sentence of thirty (30) years imprison-

ment from Kenneth Coley if he carries out all provisions of this agreement.

It is also understood and agreed that if Mr. Coley is the actual shooter of Henderson McInnis, is not truthful in any part of this agreement, or refuses to testify for the Grand Jury of Baltimore City or refuses to testify at any trials involving any other participants in the above noted shooting, the State at its option may declare this agreement void and any statements or testimony given by Kenneth Coley may be used against him. It is further understood that if the State declares this agreement void, Kenneth Coley will be charged with any and all crimes and may be sentenced to any punishment allowed by law."

Pursuant to that agreement, the appellant Coley did not simply give a signed statement. He also went before the grand jury that very morning and gave sworn testimony, in the course of which he acknowledged his guilt.

In now challenging the admissibility of his statement, the appellant Coley relies exclusively on *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), and its reiteration of preexisting Maryland law to the effect that any promise or inducement offered for the purpose of securing a confession will render that confession involuntary and inadmissible.

*Hillard v. State, supra,* does, of course, stand for just such a principle. It is, moreover, beyond dispute that an agreement by the State to accept a plea of guilty to second-degree murder rather than to push for a verdict of first-degree murder is a most significant inducement. The appellant Coley, however, has failed to heed the advice of Judge Eldridge in *Ward v. State,* 290 Md. 76, 97, 427 A.2d 1008 (1981), where he pointed out that the defendant there, even as the appellant here, "overlooks the often expressed 'admonition that language in a judicial opinion must be viewed in the context in which it appears.'" *See also Slate v. Zitomer,* 275 Md. 534, 538 n. 2, 341 A.2d 789 (1975), *cert. denied sub nom., Gasperich v. Church,* 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87 (1976); and *Bringe v. Collins,* 274 Md. 338, 343,

335 A.2d 670, 674, *appl. denied,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 475 (1975). In that regard, the appellant Coley's argument fails to recognize that the entire body of confession law, typified by such cases as *Hillard v. State,* deals with the salutary effort of courts to ventilate the incommunicado processes of police interrogation and to prevent the police from making unwarranted promises and inducements.

■ That body of law, however, has never been applied, and cannot be applied, to the legitimate (and even indispensable) process of plea bargaining. The plea bargain, by its very name, implies a *quid pro quo.* If the principles promulgated to deal with police interrogation were ever applied to the plea bargaining process, no plea could ever be voluntary. Every negotiated plea is given in exchange for some sort of promise or inducement or consideration. The inappropriateness of applying police interrogation law to the bargaining process wherein a legally trained assistant state's attorney reaches an open agreement with the defendant was thoroughly discussed in *United States v. Davis,* 617 F.2d 677, 686–687 (D.C.Cir.1979):

> "If accepted, Gelestino's argument in effect would create a rule that testimony or information given pursuant to a plea bargain is involuntary per se, for a defendant's execution of his part of a bargain is always 'induced' by the prosecution's return promises. Such a rule would be overbroad and unwarranted. In *Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976), the Supreme Court stated that 'the Court of Appeals erred when it held that any statement made as a result of a plea bargain is inadmissible.' *Id.* at 30, 97 S.Ct. at 203 (emphasis by the Court). The logic of Gelestino's approach not only would create a rule of per se involuntariness for statements made pursuant to a bargain but also would render involuntary the pleas themselves, which also derive from the Government's promises. We cannot conclude that pleas and statements resulting from plea bargaining are always involuntary. Rather, the proper task is a case-by-case

consideration of whether the defendant voluntarily entered into the plea agreement and whether he testified voluntarily, as revealed by an examination of the surrounding circumstances."

A modicum of reflection reveals that the law could not be otherwise. Once a plea bargain has voluntarily been struck between a defendant and the State, the State is, of course, bound to live up to the terms of the agreement. The obligation is not bilateral, however. A defendant, prior to the ultimate acceptance of the plea, is entitled to change his mind and back down from the agreement. The exercise of that option, however, does not date back and contaminate the earlier proceedings. The first meeting of the minds was either voluntary or it was not, and later events will not alter that historic fact.

If the law were otherwise, the complications that might result are fearful to contemplate. Could a defendant upon appeal challenge the voluntariness of his guilty plea on the solitary ground that he was induced into making it by the promise of the State to drop other charges? Certainly not! Might a clever defendant, however, claim that the voluntariness of such a plea was eroded because the trial judge failed to inform him that a pretrial confession, given pursuant to the plea arrangements, could be suppressed from evidence as involuntary under *Hillard v. State, supra?* That situation might be before us if the appellant Coley had not himself withdrawn from the plea bargain.

In considering, as we should, the ramifications of our holding, we hypothesize Coley's situation with a few additional factors. If the inducement, which is an integral part of the very plea bargaining process, would compel the suppression of a confession given pursuant to the plea bargain:

1. Would it contaminate the testimony given to the grand jury?
2. Would it compel the suppression of physical evidence obtained in the course of a consensual search, the

consent to search having been given pursuant to the same plea bargain?

3. Would it compel the suppression of a post-indictment police lineup identification following the waiver of counsel given pursuant to the same plea bargain?

4. Would it compel the suppression of Coley's in-court testimony?

5. Would it, under the fruit of the poisoned tree doctrine, compel the suppression of other evidence and/or witnesses only discovered by the police by virtue of the leads developed from the information given pursuant to the plea bargain?

6. Would it entitle the codefendants to a jury instruction to the effect that the inducement that made the confession involuntary as to Coley makes the confession less trustworthy as to them?

7. Would it, at some possible retrial, bar the submission of the first trial testimony as a prior recorded testimony exception to the rule against hearsay, if otherwise appropriate?

Can a single inducement yield a half-dozen products, some of which are voluntary and some of which are involuntary, without reducing the language to a shambles?

The ultimate paradox would be an agreement entered into by a defendant whereby he preserves his right to challenge his plea-induced statement pretrial but then agrees that he will offer a guilty plea at trial if, but only if, his pretrial motion is properly denied. He then challenges the confession, even as here, on the ground that it was the product of the bargained-for inducement.

We hold that the confession was not involuntary and was properly received in evidence.

*Contentions 8 and 9: Spin-off Contentions from Hillard*

Our immediately preceding holding with respect to Coley's confession serves to moot Coley's next two contentions. They both involve peripheral evidentiary questions going to the issue which we have now deemed to be immaterial. The

first of these contentions is that the trial judge erred in refusing to allow Coley to cross-examine Sergeant Brandner as to a conversation he overheard between Assistant State's Attorney Gersh and the appellant Coley during the plea bargaining stage. The second of these contentions is that the trial judge committed error when he refused to permit defense counsel to read to the jury, in closing argument, a passage from *Hillard v. State, supra,* dealing with the corrosive effect of an inducement on the voluntariness of a confession. Our earlier holding that the virtually omnipresent inducement which is an integral part of the plea bargaining process is not fatal to voluntariness as it would be in the very different context of incommunicado, station house interrogation of a suspect, renders both these contentions moot.*

*Contention 10: The Voluntariness of Coley's Trial Testimony*

Mootness as a result of our earlier holding on the admissibility of Coley's extrajudicial confession is also one of our alternative responses to Coley's next contention. Coley took timely exception to the following statement made by Judge Hammerman in the course of his instructions to the jury:

"What the defendant Coley said on the witness stand two days ago was free and voluntary on his part. Whether you believe what he said or not is another matter that is entirely up to you, of course. But he said it freely and voluntarily."

Our holding that no error occurred rests on two separate predicates. In the first place, Coley does not argue that there was any coercion or other improper stimulus which caused him to take the witness stand during the trial or that he was in any way not lucid while on the stand. He argues rather a "fruit of the poisoned tree" rationale, *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Hillard v. State, supra,* in that once having given an involuntary, extrajudicial confession, he may have deemed it

---

* This is not a case where, as the appellant Coley would have it, the judge made a preliminary determination as to voluntariness and the jury would then have the opportunity to relitigate that issue on replay.

futile not to reiterate it from the witness stand. We observe, only in passing, that he did not in fact reiterate but gave a version of the facts diametrically opposed to that contained in his earlier confession. So much for Coley's sense of resigned futility. More directly dispositive, however, is the fact that our holding that the extrajudicial confession was not involuntary renders the tree nonpoisonous and its alleged fruit, therefore, nonpoisoned.

■ Quite independently of that rationale, we note the concession in the appellant Coley's brief that the effective cause for his decision to take the witness stand at trial was not the existence of the earlier confession but rather a felt compulsion to testify "because of how Taylor and Woods had testified." When the appellant alleges one factual explanation for his decision, we are relieved of the onerous responsibility to negate other hypothetical possibilities.

*Contention 11: The Indefiniteness of the Sentence*

The appellant Coley will fare better with his final contention. The trial judge imposed upon Coley a sentence of life imprisonment and then suspended fifteen years of that sentence. When Coley's counsel quizzically inquired, "How does that work?", the court replied, "That is up to the Parole Board, not up to me." The appellant Coley now contends that he is entitled to be resentenced because the sentence actually imposed was indefinite.

■ There is, of course, much validity to the State's observation that the language of sentencing is impressionistic at best and cannot realistically be expected to be otherwise. The abacus of industrial time and good behavior time, manipulated so adroitly by correction and parole authorities, is something largely beyond the ken of mere judges. The special language of life imprisonment, moreover, has unique semantic hazards of its own. Any sentence of more than life is but a symbol by which the judge tries to communicate to the parole authorities, should the parole authorities care to know, that the judge thinks that parole should be used

---

It is rather the case that, as a matter of law, the entire issue is immaterial and the jury would not, therefore, be entitled to consider evidence bearing upon that immaterial issue.

sparingly. A sentence of life plus twenty years does not suggest that the warden may not release the body to the undertaker until twenty years after the prisoner's death. Consecutive life sentences do not contemplate reincarnation. Much of what a judge says about life imprisonment is more the language of poetry than the language of mathematics.

■ All this having been said, however, it still remains desirable that we strive to attain at least as much certainty as we can. *Lewis v. State,* 228 Md. 600, 604, 180 A.2d 839 (1962). We agree with the appellant Coley that in this case, some clarification is in order. It may well have been that what the sentencing judge intended to impose was a sentence of life imprisonment, all but fifteen years of which would be suspended. A definite term of imprisonment followed by a suspension of the remainder of the sentence gives clear guidelines to the prison authorities, to the Parole Board, and to the appellant himself. The very indefiniteness of a life expectancy, however, would make it impossible for the parole authorities to calculate backward from an uncertain date. The sentence as to Coley, therefore, will be vacated and the case will be remanded for resentencing.

This concludes our consideration of all contentions raised by the appellant Coley.

### Contention 12: The Announced Verdict Versus the Verdict Sheet

■ We turn finally to the two contentions raised exclusively by the appellant Wright. The first of these is that the trial judge erred in accepting a verdict of guilty on the charge of using a handgun in the commission of a crime of violence where the verdict sheet indicated that the jury had acquitted Wright of that offense. The point is without merit. The jury's verdict was rendered orally, in open court. Md.Rule 759 a. The so-called "verdict sheet" was not in any way a part of the jury's verdict in this case. There is no indication as to when or why the "verdict sheet" was checked as it was. Following the forelady's announcement

of the verdict, the jurors were individually polled and each one expressed agreement with the announcement of the verdict by the forelady. The clerk recorded the verdict and the jury was then harkened to the verdict as recorded. The so-called "verdict sheet" had merely been provided as an aid to the jury's deliberations; the judge told the jury that they were not required to use it. Whatever scrawling or doodling may have appeared upon that unofficial piece of paper was simply not a part of the actual verdict rendered. It was but graffiti on the juryroom wall.

### Contention 13: The Impact of the Directed Verdict on the Attempted Robbery Charge

The appellant Wright's final contention is Hydra-headed and threw us initially off-balance in our effort to come to grips with it. The record of that bafflement may be instructive for others who are similarly distracted from the real problem by more immediate concern with an apparent problem that turns out to be illusory.

At the end of the State's case, the appellant Wright moved for a judgment of acquittal as to all counts. Judge Hammerman denied the motion as to the charges of first-degree murder and conspiracy to commit murder, but granted the motion as to the charges of attempted robbery with a deadly weapon and conspiracy to commit robbery. It will be remembered that as of that point in the trial, Coley's confession (later admitted as substantive evidence and against all defendants) was admitted only against Coley. As Judge Hammerman granted Wright's motion in these two regards, he remarked:

"I agree with defense counsel that there is not sufficient evidence to require the Defendants to put on a defense with respect to the charges of attempted armed robbery and subordinate counts, nor the charge of conspiracy to commit armed robbery except for the Defendant Coley. I just cannot accept the State's position that there is that sufficient evidence, that reasonable inferences could be drawn. I think it will allow the jury to speculate far too

much. These are criminal charges and there must be a much more exacting demand upon the State in criminal charges...."

## A. *The False Trail*

■ The ultimate verdict of guilty of first-degree murder as to Wright was based upon a finding of felony-murder, not upon a finding of premeditated killing. That felony-murder, on the facts of this case, depended exclusively upon the predicate of attempted robbery. Wright's contention, compellingly plausible in microcosm, is that this particular felony-murder and the underlying attempted robbery are "the same offense" within the contemplation of *Newton v. State,* 280 Md. 260, 268, 373 A.2d 262 (1977); *State v. Frye,* 283 Md. 709, 712, 393 A.2d 1372 (1978); and *Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). Wright argues that once having been acquitted of attempted robbery, he may not later be convicted of "the same offense" under traditional double jeopardy notions of *res judicata.* In the alternative, he invokes the collateral estoppel variety of double jeopardy protection, arguing that the acquittal on the underlying offense precludes the State from later relitigating that "fact" against him as an indisputable element of the felony-murder offense.

We were tentatively beguiled. Immersed uncritically in the minutiae of traditional double jeopardy, *res judicata* and collateral estoppel, we lost sight of their larger features. Busily calibrating and computing the precise location of the pew, we overlooked the threshold question of whether we were even in the right church. We were following foursquare the internal logic of Wright's syllogism, when lost perspective returned with a jolt. This may be some other kind of problem: a problem involving inconsistent verdicts, perhaps; a problem involving the legal sufficiency of the evidence, unquestionably; but *not,* repeat *not,* a double jeopardy problem.

The issue is: *Within the limited context of a single trial* involving a number of closely or loosely related charges,

what double jeopardy implications does a favorable disposition on one of those charges have for the remaining charges still at issue: duplicitous identical charges; greater inclusive charges; lesser included charges; collaterally related charges; totally unrelated charges? We ask not what other implications there may be involving other legal issues such as consistency in verdicts or legal sufficiency of evidence, but only what *double jeopardy* implications there are? The answer is, "None"; for this is not the time frame that engages the gears of double jeopardy's even preliminary concern.

B. *Former Jeopardy as a Plea in Bar to Subsequent Jeopardy: Its Fundamentally Sequential Character*

██ From the mountain top, double jeopardy's salient features emerge again in their pristine clarity. It is not a defense upon the merits. *It is a defense in bar.* No facility with latter-day double jeopardy law is possible without the appreciation of that predominant—that transcending—characteristic as the conceptual point of departure.

██ Double jeopardy, it is now fully understood, is not a species of law but a broad genus, embracing within its compass four distinct species: 1) traditional former jeopardy (*autrefois acquit* or *autrefois convict*); 2) the multiple punishment prohibition even within the simultaneous context; 3) the broad body of mistrial/retrial law; and 4) collateral estoppel. With the single exception of the prohibition against simultaneous multiple punishment, all of the double jeopardy protections are sequential by their very nature. Basic double jeopardy law is frequently characterized as "*res judicata* in prison gray." The prohibition, where applicable, is against instituting a new and subsequent jeopardy following the termination of an earlier jeopardy. It has nothing to do with the continuing or discontinuing of the self-evidently simultaneous jeopardies that are the inevitable consequences of latter-day multi-count indictments and latter-day multi-indictment trials. The very possibility of confusion on this score would never have arisen if Sir William Blackstone had

not, perhaps inadvertently, substituted the usage "double jeopardy" for the original and clearer usage "former jeopardy."

The critical moment is when the first jeopardy terminates. That termination, under appropriate circumstances, will bar in advance the very institution of a new and subsequent jeopardy. It has nothing to do with the continuation of a preexisting, parallel jeopardy.

The basic character of this first and traditional double jeopardy protection, in both of its sub-manifestations, and the undergirding social purposes intended to be served by this protection were fully discussed in R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1983), at 434–435:

"To the extent to which it used English at all instead of French or Latin, the early common law spoke of former jeopardy rather than of double jeopardy. This usage served to make clear that the law was dealing with sequential jeopardy and not with simultaneous jeopardy. The notion was that a defendant should not be initially placed in jeopardy, which jeopardy ended in either a conviction or an acquittal, and then be subsequently placed in jeopardy yet a second time.

Even the limited former jeopardy species of our general double jeopardy law grew out of two distinct and early common law pleas in bar. These were the pleas of: (1) *autrefois acquit,* and (2) *autrefois convict.* They simply meant, respectively: (1) 'At another time, he was acquitted,' and (2) 'At another time, he was convicted.'

The purposes served by the two pleas in bar were different. The plea of *autrefois acquit* served to implement the principle that no one should be twice vexed for the same offense. Once a person has been tried and has been acquitted, that was deemed to have ended the matter. It was considered improper for the Crown or the State "to have another go at" a defendant who had successfully run the gauntlet and been acquitted. In-

volved here are some of the same considerations that animate the notion of *res judicata* in the civil courts and, indeed, several commentators have referred to the plea in bar of former acquittal as '*res judicata* in prison gray.'

The plea in bar of *autrefois convict,* on the other hand, was intended to implement the distinct principle that no one, even a convicted felon, should be subjected to multiple punishment for the same offense. Hence, once a defendant had been convicted and sentenced, that served to bar a new trial which could have operated only to add additional punishment to that already being inflicted.

It is obvious that former jeopardy, in either of its manifestations, does not engage its gears until a verdict has been rendered in the first case. The first jeopardy is not completed until there has been a verdict of either acquittal or conviction. Until there has been the consummated fact of initial jeopardy, there cannot, by definition, be a subsequent jeopardy."

Neither double jeopardy, nor any other plea in bar, is interposed as a defense in the middle of an ongoing trial. A judgment of acquittal on assault with intent to murder does not keep the trial from going forward on a simple assault charge, even though the two are for some purposes "the same offense." [1] A judgment of acquittal on first-degree murder does not keep the trial from going forward on the issues of second-degree murder or manslaughter, even though all three are for some purposes "the same offense." Anticipating the possibility of inconsistent verdicts, the defense attorney may not insist that the jury render the

---

1. A *properly granted* judgment of acquittal on simple assault, to be sure, might well compel the granting of a similar judgment of acquittal on assault with intent to murder. This, however, would not be because of any double jeopardy consideration but for the very different reason that a properly granted judgment of acquittal on the lesser charge would establish, by definition, that the evidence was legally insufficient to permit going forward on the greater charge. This is an issue in the present case, which will be discussed subsequently. For immediate purposes, the point is that although it may be an issue, it is *not* a double jeopardy issue.

acquittals first, so that he may immediately interpose a double jeopardy challenge to any subsequent rendering of convictions on charges that might arguably be "the same offense." This intra-trial time sequence is simply not the context to which double jeopardy law applies.

The third of double jeopardy's four species, the mistrial/retrial law, involves, just as surely as does the first species, the sequential context of the termination of an initial jeopardy followed by the institution of a fresh and subsequent jeopardy. It was in the exclusive service of this particular species of double jeopardy law, with its unique purpose of guarding a defendant's right to stay with the tribunal that had first been impaneled, that the very attachment of jeopardy moved backward in time from the rendition of the verdict to the swearing of the jury (in jury cases) and the first presentation of evidence (in the nonjury cases). *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). The inherent notion of sequence, however, was not remotely affected. If, for some reason, a mistrial (perhaps because of a faulty indictment) had to be declared on one indictment in a multi-indictment trial or as to one count of a multi-count indictment, the only double jeopardy considerations involved would be as to the constitutional propriety of the subsequent retrial on the charges as to which a mistrial had been declared. As to other charges on which a mistrial had not been declared, there would be no remote impediment to going forward with the trial, even if some of those charges could, for multiple punishment purposes, be deemed "the same offense" as the charge whereon the first jeopardy had terminated by virtue of the mistrial.

The fourth of double jeopardy's four species, collateral estoppel, just as surely contemplates a successful termination of the first jeopardy only as a bar to the subsequent reinstitution of a fresh jeopardy. Indeed, every collateral estoppel case urged upon us by the appellant Wright is in this sequential context, as indeed all collateral estoppel cases are, and not in the intra-trial context of his own situation.

The source case that incorporated collateral estoppel law into the constitutional double jeopardy law for the first time was *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). It is the standard to which all collateral estoppel cases repair. Its context was indisputably and exclusively sequential. The defendant Ashe received the benefit of a jury verdict on the ultimate merits of seven separate offenses in May, 1960. When the State, aggrieved by the seven acquittals, sought to bring him to trial on a separate but related case *six weeks later,* the collateral estoppel plea in bar was interposed. In discussing the utility of such a plea as a bar to the very commencement of the subsequent jeopardy, the Supreme Court held, at 397 U.S. 443, 90 S.Ct. at 1194:

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties *in any future lawsuit.*" (Emphasis supplied).

In the wake of *Ashe v. Swenson,* the Supreme Court has decided three other collateral estoppel cases. Each of the three is indisputably in the clear sequential context of the second jeopardy's only beginning after the first jeopardy had been terminated. In *Simpson v. Florida,* 403 U.S. 384, 91 S.Ct. 1801, 29 L.Ed.2d 549 (1971), the defendant had been acquitted, in 1968, of the armed robbery of a store manager. Under the facts of the case leading to the acquittal, the defendant successfully interposed a plea of collateral estoppel to his subsequent trial for the robbery of a customer who had been in the store at the time of the alleged robbery. *Simpson v. Florida* cited *Ashe v. Swenson* for its proposition that collateral estoppel "bars relitigation between the same parties of issues actually determined *at a previous trial.*" 403 U.S. at 385, 91 S.Ct. at 1802. (Emphasis supplied).

*Harris v. Washington,* 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971), involved the defendant's acquittal of one murder

and subsequent rearrest, followed by the filing of an information, on another murder, both murders arising out of the same facts. The sequential setting was clear, as the Supreme Court pointed out, at 404 U.S. 56–57, 92 S.Ct. at 184:

> "*The State concedes that the ultimate issue of identity was decided by the jury in the first trial.* That being so, the constitutional guarantee applies, irrespective of whether the jury considered all relevant evidence, and irrespective of the good faith of *the State in bringing successive prosecutions.*" (Emphasis supplied).

In *Turner v. Arkansas,* 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972), the sequence was a verdict of acquittal on a murder charge at a first trial ending on April 24, 1969, followed by a subsequent indictment on October 3, 1969, charging the robbery of the same victim. The Supreme Court decisions on collateral estoppel, even from the pre-constitutional days, involve this same clear sequence of the second jeopardy's only commencing after the first jeopardy has been terminated. *United States v. Oppenheimer,* 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916); *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

In *Cousins v. State,* 277 Md. 383, 388, 354 A.2d 825 (1976), cert. denied, 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976), the Court of Appeals pointed out the sequential nature of collateral estoppel law, as a protection *"barring a second prosecution* where the ultimate issues to be litigated have already been resolved in the accused's favor *in a prior action."* (Emphasis supplied). Judge Eldridge there explained that except as it affects multiple punishment, the double jeopardy protection is a bar to *subsequent* trials. "[T]he prohibition against double jeopardy . . . *bars successive trials* as well as multiple punishments for the same offense." 277 Md. at 388, 354 A.2d 825. (Emphasis supplied).

Judge Levine in *Cook v. State,* 281 Md. 665, 668, 381 A.2d 671 (1978), cert. denied, 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978), analyzed collateral estoppel in both its civil and

criminal settings, observing that it applies "where *a prior judgment* is relied upon to preclude *a second adjudication . . . in subsequent litigation*." (Emphasis supplied). *And see MPC, Inc. v. Kenny,* 279 Md. 29, 32–33, 367 A.2d 486 (1977); *Washington Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 18–19, 376 A.2d 505 (1977). He went on to emphasize that "once an issue of ultimate fact has been determined by a final and valid judgment, that issue cannot *again* be litigated between the same parties *in any future lawsuit*." 281 Md. at 669, 376 A.2d 505. (Emphasis supplied).

The landmark Maryland case on collateral estoppel is *Powers v. State,* 285 Md. 269, 401 A.2d 1031 (1979), *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979). The setting was again sequential, involving an attempt to subject the defendant to successive trials. Judge Davidson carefully contrasted the case of *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), where "inconsistent verdicts which occur . . . in a single trial" can stand, with *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948), where "inconsistent verdicts, *when reached in successive trials,* could not stand." 285 Md. at 276–277, 401 A.2d 1031 (Emphasis supplied). She pointed out that, in the context of successive trials, the earlier acquittal operates as a bar to the very bringing of the second prosecution, "This case established not only that inconsistent verdicts, when reached *in successive trials,* are not permissible, but also that once a person has been acquitted, the federal government cannot *prosecute him a second time* for a related offense having a common issue of ultimate fact essential to conviction, which the previous acquittal had determined in his favor." 285 Md. at 277, 401 A.2d 1031. (Emphasis supplied). The sequence involves successive trials, not successive events within a single trial. The double jeopardy bar is an inter-trial preventative, not an intra-trial remedy. The *Powers* opinion characterized *Ashe v. Swenson, supra,* as having established the guidelines whereunder "a state cannot prosecute [a defendant] a second time." 285 Md. at 279.

It quoted with approval *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199 (1957), as it described double jeopardy as "a bar to a subsequent prosecution."

In noting the sequential similarity between collateral estoppel and *res judicata, Powers* approved the analysis of Judge Friendly in *United States v. Kramer,* 289 F.2d 909, 916 (2d Cir.1961), that, "The very nub of collateral estoppel is to extend *res judicata* beyond those cases where the prior judgment is a complete bar." 285 Md. at 283, 401 A.2d 1031. Every syllable of the *Powers* decision reaffirms the sequential character of its holding. "[T]he State may not proceed with a second prosecution." 285 Md. at 286, 401 A.2d 1031. "The primary purpose of the doctrine of collateral estoppel . . . is to avoid compelling an accused to prove his innocence to two or more juries." 285 Md. at 287, 401 A.2d 1031. "[An accused should not be] compelled again to prove his innocence before a second jury in a second trial." 285 Md. at 288, 401 A.2d 1031. "[T]he accused is precluded from being tried a second time." 285 Md. at 288, 401 A.2d 1031. "The doctrine of collateral estoppel, therefore, precludes a second prosecution." 285 Md. at 290, 401 A.2d 1031. *See also Carbaugh v. State,* 294 Md. 323, 329, 449 A.2d 1153 (1982).

In *Mitchell v. State,* 44 Md.App. 451, 455–456, 409 A.2d 260 (1979), Judge Wilner, for this Court, contrasted the inconsistency between verdicts which is permitted within a single trial but is not permitted in separate and successive trials:

"When rendered at the same trial, however, such inconsistent verdicts may stand. . . .

. . . . .

The same rationale does not necessarily apply, however, where the inconsistency would arise from separate and successive trials."

In the last analysis, the double jeopardy clause deals with *the very attachment of jeopardy, not with the termination of jeopardy* that has already validly attached. It is a bar, not a cure.

If the granting of the judgment of acquittal by the trial judge on the ground that the evidence was not legally sufficient to prove attempted robbery were to be deemed by us to be the functional equivalent of a verdict of acquittal on the merits by the fact finder,[2] the only collateral estoppel consequence would be to bar a subsequent trial for felony-murder where the State's proof would involve a relitigation of this "fact" which has already been determined in the appellant Wright's favor. That, of course, is not the situation at bar.

### C. The Multiple Punishment Bar as the Only Exception to the Sequential Posture

 The exclusive and limited occasion on which the double jeopardy protection operates in anything other than the context of successive trials is when it bars multiple punishment for "the same offense." This prohibition against multiple punishment may operate not only in the traditional sequential setting but also in the setting of a single trial. Judge Eldridge pointed out for the Court of Appeals in *Thomas v. State,* 277 Md. 257, 261, 353 A.2d 240 (1976):

> "Traditionally, the Fifth Amendment prohibition against placing a defendant twice in jeopardy for the same offense has been said to extend to *three distinct situations. It bars a second prosecution* for the same offense *after an acquittal, a second prosecution* for the same offense *after a conviction,* and multiple punishments for the same offense." [3] (Emphasis supplied).

See also in this regard, *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–665 (1969).

---

**2.** That is a matter by no means free from doubt, which is fortunately not before us.

**3.** He went on in a footnote to list the other two, latter-day, and nontraditional aspects of the double jeopardy protection: collateral estoppel and mistrial/retrial, both of which operate only in the setting of successive trials.

Although it took some time for the analysis to reach its present level of refinement, it is now clear that a large part of the case law dealing with the multiple punishment aspect of double jeopardy is of a decidedly "junior varsity" constitutional status, if not indeed subconstitutional. Traditional double jeopardy law, of course, operates as an absolute and constitutional bar to multiple punishment for the identical offense. A humane rule of lenity, however, has grown up to guard against other forms of arguably multiple punishment, not cleanly prohibited by the double jeopardy bar. A more expansive reading of the phrase "the same offense" has emerged, tracing largely from *Morey v. Commonwealth,* 108 Mass. 433 (1871); and finding expression at the Supreme Court level in *Gavieres v. United States,* 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911), and *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). The Supreme Court has more recently made it absolutely clear, however, that this entire body of law is not of constitutional dimension but is rather a rule of statutory construction. The courts will defer to any clearly discernible legislative intent and will only prohibit multiple punishment for offenses that are not literally identical in those cases where the legislative intent is to impose only a single punishment or where the legislative intent is in doubt. The Supreme Court pointed out in *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1142, 67 L.Ed.2d 275, 282 (1981):

"The *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent."

See also *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

Indeed, in *Missouri v. Hunter,* 459 U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court placed its

constitutional imprimatur upon cumulative, or multiple, punishments imposed upon a Missouri defendant for two closely related offenses that clearly qualified as "the same offense" under the *Blockburger* test.[4] The Court explained, at 459 U.S. at ———–———, 103 S.Ct. at 679, 74 L.Ed.2d 543–544:

> "The rule of statutory construction noted in *Whalen* [*v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)*] is not a constitutional rule requiring courts to negate clearly expressed legislative intent. . . . Legislatures, not courts, prescribe the scope of punishments.
>
> Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial."

The appellant Wright relies upon the two Maryland cases of *Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977), and *State v. Frye,* 283 Md. 709, 393 A.2d 1372 (1978), and the Supreme Court case of *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (per curiam), as support for his proposition that the attempted robbery in this case and the felony-murder in this case were "the same offense" within the contemplation of the *Blockburger* test. Of course, they were. As to this, there is no quarrel. The appellant's authorities are relevant to support his proposition; his proposition, however, is immaterial to the issue under review. Both *Newton* and *Frye* stand for the proposition that unless and until the Maryland Legislature declares a contrary contention, the underlying felony (or attempted felony) will merge into the felony murder for purposes of guarding against multiple punishment. *State v. Frye,* at

---

4. Such a permissive and deferential attitude, of course, would not prevail in a rare case where a court sought to impose, or a legislature sought to authorize, successive or multiple punishments for the same identical offense. That would touch the hard core of the constitutional prohibition itself.

283 Md. 716, 393 A.2d 1372, makes that context and purpose indisputably clear: "[W]e held in *Newton* that felony-murder and the underlying felony are to be considered one offense *for purposes of multiple punishment.*" (Emphasis supplied). The Supreme Court's decision in *Harris v. Oklahoma, supra,* dealt with precisely the same problem of avoiding multiple punishment. It prohibited the State of Oklahoma from trying the defendant on the underlying felony after he had already been convicted and sentenced for the greater, inclusive felony-murder.

The principle established by these cases has no bearing on the appellant Wright's situation. He could not have been sentenced cumulatively for both the felony-murder and the attempted robbery; and, of course, he was not so sentenced. He suffered no multiple punishment, and that is the only thing that his authorities would prohibit.

### D. *The Ultimate Inapplicability of Double Jeopardy Law*

What the appellant Wright has done has been to wrench words and phrases loose from the multiple punishment context and then ingeniously to insinuate them into a collateral estoppel or *res judicata* analysis, even as he earlier wrenched notions of "before" and "after" loose from the context of successive trials and ingeniously inserted them into the very different context of a single trial. R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* at 440, spoke to the linguistic problem that pervades this body of law:

> "Some of the dangerously universal language, uttered in the distinct context of former jeopardy situations, about the termination of the first jeopardy precluding a second jeopardy can give rise to false, but difficult to handle, contentions in situations such as these. It is why the language from the former jeopardy cases should be pinned down specifically to the former jeopardy context and not allowed to roam dangerously abroad in the generic label of undifferentiated 'double jeopardy.'

The double jeopardy problem that arises in the specific context of simultaneous jeopardy is that of avoiding multiple punishment."

In the remarkably analogous case of *Bynum v. State,* 277 Md. 703, 357 A.2d 339 (1976), *cert. denied,* 429 U.S. 899, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976), the Court of Appeals characterized a similar contention as "ingenious if not novel," but ultimately held "it to be without merit." 277 Md. at 705, 357 A.2d 339. A simple robbery there was a lesser included offense to an armed robbery, just as the attempted robbery here was a lesser included offense within the felony-murder. Jeopardy attached on both offenses there even as it attached on both offenses here. At the end of the State's case there, as here, the jeopardy on the lesser included offense was terminated in the defendant's favor, even as it was here. The mechanism of successful termination there was the entry of a *nolle prosequi* by the State, but the Court of Appeals pointed out that "[t]he same result would have obtained had the court, rather than the prosecutor, dismissed the robbery charge by granting partial judgment of acquittal." 277 Md. at 709, 357 A.2d 339. The defendant there, as the defendant here, interposed the ingenious argument that the successful termination of jeopardy at the end of the State's case precluded the subsequent submission of the greater inclusive offense ("the same offense," after all, under *Blockburger*) to the jury on the ground that it would violate his protection against being placed twice in jeopardy for the same offense.

In a scholarly analysis by Judge Levine, the Court of Appeals agreed with the specific premises put forth by Bynum in microcosm but spotted the "fundamental flaw" in macrocosm. Judge Levine reasoned, at 277 Md. 707–708, 357 A.2d 339:

"There is, nevertheless, a fundamental flaw in appellant's claim that he was twice placed in jeopardy. Double jeopardy is not suffered unless a man is twice put to trial... The purpose of the prohibition of double jeopardy, questions of double punishment aside, finds expression

in the maxim *nemo debet bis vexari pro una et eadem causa,* no one shall be twice vexed for one and the same cause... More specifically, a defendant is not to be put to the expense of defending himself in successive unnecessary trials of the same issue, subjected to the stigma which attaches in further criminal prosecutions, or denied the psychological security, available in civil cases by reason of the doctrine of *res judicata,* of considering a matter once tried to be closed....

It is evident that where, as here, the defendant is subjected to but a single prosecution, trial and jury verdict, there exists none of the evils which the double jeopardy prohibition is intended to prevent. Appellant has neither been harassed by multiple prosecutions, nor has he been subjected to the increased probability of conviction attendant upon repeated trials."

The Court of Appeals went on to hold by way of conclusion, at 277 Md. 709, 357 A.2d 339:

"We therefore hold that *the double jeopardy prohibition,* though barring subsequent prosecution for offenses charged in counts dismissed by a *nolle prosequi* entered without the consent of the accused after jeopardy has attached, *has no application in the context of the same prosecution* which continues on other counts." (Emphasis supplied).

*Accord, Ward v. State,* 290 Md. 76, 92, 427 A.2d 1008 (1981): "The reason for our holding was that settled double jeopardy principles *did not preclude the continuation of the same trial* on a different count, as the defendant was not being 'twice put to trial.'" (Emphasis supplied).

E. *The Inconsistency of the Verdicts*

 The appellant Wright strenuously maintains that the judgment of acquittal on the underlying attempted robbery and the jury verdict of guilty on felony-murder were inconsistent. Once again, he is right. Once again, it is immaterial. Logical consistency in verdicts is simply not mandated by our law. If the jury had rendered the inconsistent

verdicts, the inconsistency as such would be no ground for reversal. Justice Holmes was unequivocal in this regard as early as *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932): "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it were a separate indictment." The Court of Appeals has regularly subscribed to the same principle of law. *Johnson v. State,* 238 Md. 528, 541, 209 A.2d 765 (1965): "When there has been a conviction by a jury on one count and an inconsistent acquittal on another count, we have held that the conviction may stand." *See also Ledbetter v. State,* 224 Md. 271, 167 A.2d 596 (1961); *Leet v. State,* 203 Md. 285, 293–294, 100 A.2d 789 (1953). If there remained any doubt, the *coup de grace* was administered by Judge Digges in his scholarly analysis in *Ford v. State,* 274 Md. 546, 551, 337 A.2d 81 (1975), in which he pointed out "that this 'hobgoblin' of what appears to be jury verdict inconsistency, which haunts the petitioner in this case, has long been exorcised not only by this Court but also by many other courts across this nation."

■ In 1981, the Supreme Court made clear that the human flaw of inconsistency which will be tolerated in a jury will also be tolerated in a judge, when he, as ultimate fact finder, inconsistently both acquits and convicts on the same facts. *Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981). Nor will inconsistency, simply on the basis of the inconsistency, be fatal when a judge is entering directed judgments of acquittal, either at the end of the State's case or at the end of the whole case. As we pinpoint the moment for analysis in this case, we direct attention to the fact that the inconsistency that matters is not the secondary inconsistency between the judgment of acquittal at the end of the State's case and the ultimate jury verdict.[5]

---

5. Obviously, an appellant could not complain that an ultimate jury verdict of guilty on a particular count was inconsistent with an earlier judgment of acquittal on a related count if that appellant had

That was a mere consequence. The source was the earlier inconsistency, on motion at the end of the State's case, between granting the judgment of acquittal on one charge and not granting it on the other charge.

With respect to such situations, the law was clearly stated by Chief Judge Sobeloff in *Williams v. State,* 204 Md. 55, 64, 102 A.2d 714 (1954):

> "Each count of an indictment is regarded as if it were a separate indictment, and the inquiry is whether the evidence is sufficient to support the conviction on that count without regard to the disposition of other counts."

*See also Ford v. State, supra,* at 274 Md. 552, 337 A.2d 81; *Mitchell v. State, supra,* at 44 Md.App. 456, 409 A.2d 260; *Dunn v. United States, supra,* at 284 U.S. 393, 52 S.Ct. at 190.

### F. *The Motions for Judgment of Acquittal*

Although the felony-murder conviction cannot be challenged on double jeopardy grounds and cannot be challenged on the grounds of inconsistency, it is not necessarily immune to challenge. The proper pigeonhole for that challenge will be the handling of the appellant's motions (both at the end of the State's case and at the end of the entire case) for a judgment of acquittal as to felony-murder. In that regard, we will look to the propriety of the court's action, to use Chief Judge Sobeloff's words, with respect to "that count without regard to the disposition of other counts." 204 Md. at 64, 102 A.2d 714.

■ If the State has met its burden of production and mounted its *prima facie* case with legally sufficient evidence as to the underlying felony (or attempt thereat), a defendant's motion will have been properly denied, notwithstanding the fact that he received a judgment of acquittal on the count charging the underlying offense. A "foolish consist-

---

never made a timely motion for a judgment of acquittal with respect to the count that ultimately went to the jury.

ency" will not mandate that two wrongs are necessary to make a right. The motion for judgment of acquittal will be deemed to have been properly denied and that will end the analysis.

If, on the other hand, the motion for judgment of acquittal on the underlying felony (or attempt thereat) was properly granted, a defendant may, if it has been properly preserved, have an unassailable contention with respect to the felony-murder charge. The validity of his position, however, will not depend upon the disposition of that companion charge, for his position would be just as strong if the companion charge had never been in the case. What happened or didn't happen to the companion charge is coincidental. It is rather the case that the external events themselves that made the granting of the motion on the companion charge proper would also compel the granting of the motion as to the felony-murder. We look to the disposition of this charge in a vacuum.

 In the present case, it is unnecessary for us to look at the legal sufficiency of the evidence at the end of the State's case to allow the State to go forward on the charge of felony-murder based on attempted robbery. It may have been the case that the appellant Wright got more than he was entitled to when he received the judgment of acquittal on the actual charge of attempted robbery. *See,* for instance, *Felkner v. State,* 218 Md. 300, 146 A.2d 424 (1958); *Clemons v. State,* 228 Md. 237, 238, 179 A.2d 418 (1962): "But we think an inference of intent can be drawn from the circumstances of the instant case. It is not without significance that no other motive was shown. Cf. *Robinson v. State,* 53 Md. 151." It is certainly arguable that when four masked men enter a commercial establishment with drawn guns and kill a security guard, a motive of robbery may be inferred in the absence of any other logical explanation. All of this, however, is unnecessary for us to decide, for follow-

ing the denial of the appellant Wright's motion for judgment of acquittal, he offered evidence in his own defense. Maryland Rule 756a unequivocally provides:

"If the motion is not then granted, the defendant may offer evidence, but if so, he withdraws his motion."

*Winkles v. State,* 40 Md.App. 616, 392 A.2d 1173 (1978); *Williams v. State,* 19 Md.App. 204, 310 A.2d 593 (1973); *Martin v. State,* 10 Md.App. 274, 269 A.2d 182 (1970); *Richardson v. State,* 6 Md.App. 448, 251 A.2d 924 (1969). From that stage of the proceedings, there is nothing now before us for appellate review.

■ The appellant Wright, to be sure, renewed his motion for a judgment of acquittal at the end of the entire case. We assess the propriety of that denial as the accumulated evidence stood at that time. The appellant has no arguable case measured at that moment, for by that time the various extrajudicial and judicial statements of the co-appellant Coley were in evidence for all purposes to establish that the four gunmen went into the store for the purpose of committing robbery. Self-evidently, the motion was properly denied, and the case properly submitted to the jury. *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968); *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331 (1970).

## G. *The Handgun Charge*

*A fortiori,* the appellant Wright's subcontention that he was erroneously convicted of the use of a handgun in the commission of a felony or crime of violence on the grounds of 1) double jeopardy, 2) inconsistency in the verdicts, and 3) the legal insufficiency of the evidence must fall, for all of the same reasons discussed above.

ALL JUDGMENTS OF CONVICTION AFFIRMED; SENTENCE AS TO COLEY VACATED AND CASE REMANDED FOR RESENTENCING; COSTS TO BE PAID BY APPELLANTS.